Per Curiam:
This case was referred pursuant to Rule 57(a) to Trial Commissioner Paul H. McMurray with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed on April 28, 1964. Exceptions to the commissioner’s findings of fact and recommended conclusion of law were filed by the plaintiff, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel for the defendant and the third party, and without oral argument by plaintiff. The court agrees with the commissioner’s findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and the petition is dismissed.
OPINION OE THE COMMISSIONER
Plaintiff filed this suit seeking to recover the value of manganese ore allegedly delivered to defendant. There is no controversy concerning the receipt by defendant of a certain *539 amount of manganese ore from plaintiff and the third party-defendant. The dispute arises because of the plaintiff’s insistence that (1) defendant received a large quantity of manganese ore from plaintiff for which plaintiff received no payment, and (2) defendant made payments in part to the wrong party, the third party defendant in this action.
On June 11,1953, plaintiff, Fred Lentz, and the third party defendant, J. L. McElvany, entered into a joint venture agreement. The agreement set out the purpose of the joint venture as the mining and/or milling and selling of ore obtained from two mining claims known as Black Crow No. 1 and Black Crow No. 2 in the Planet Mining District of Yuma County, Arizona. Plaintiff had leased these mining tracts for a five-year period beginning on May 23,1953, from B. H. Chisholm. Plaintiff had negotiated the lease and was to devote his entire time to the venture utilizing prior mining experience, whereas the third party defendant, McElvany, was to provide certain equipment for use in the mining operations. Each party to the agreement made a contribution of $1,000, which was to be deposited in a bank at Parker, Arizona, in the name of Lentz and McElvany. Either party could draw on this account for purposes within the scope of the agreement, but neither of the parties had “any right, power, or authority to incur any obligation of any nature of whatsoever kind or character not directly connected” with the joint venture. On October 22,1953, plaintiff and the third party defendant entered into a supplement to the joint venture agreement whereby J. L. McElvany was to receive “bare rental” for equipment used in the mining of the ore after July 11, 1953. This minimal rental, assessed whether the equipment was used or not, constituted an overhead charge against the mining venture.
In order to function under their joint venture agreement, it was necessary for Lentz and McElvany to obtain a certificate from General Services Administration (hereafter referred to as GSA) authorizing the parties to sell manganese ore to defendant pursuant to the National Production Act of 1950, as amended. On June 11,1953, plaintiff sent a letter to *540 the GSA Kegional Office at San Francisco, California, reading as follows:
I wish to participate in the Domestic Manganese Program at Wenden, Arizona, tinder the joint name of Fred Lentz and J. L. McElvany.
Please mail the certificate of authorization to ns at Parker, Arizona, General Delivery.
By letter dated June 18, 1958, GSA issued Certificate No. 9-110 authorizing the plaintiff and the third party defendant to deliver manganese ore to the defendant in accordance with the minimum specifications of the program. Two pertinent specifications were: (1) the ore had to contain a minimum of 15 percent manganese before it was acceptable, and (2) if the ore contained 15 percent manganese or more, the payments were determined by sliding scale established by defendant.
Lentz and McElvany made their first delivery of ore under Certificate No. 9-110, described as Lot No. 1, on October 26, 1953. Lot No. 1 contained 22.35 long dry tons of 30.7 percent manganese ore which had been hand picked to insure that the ore met the required minimum percentage of manganese. On November 9,1953, defendant issued a check in the amount of $999.72 in payment of Lot No. 1. The payee was “Lentz and McElvany”, address General Delivery, Parker, Arizona. The check was endorsed “Lentz and McElvany by Fred Lentz” and deposited by the plaintiff in a bank at Parker, Arizona. On November 9, 1953, the joint venture made another hand picked shipment, 47.54 long dry tons, yielding 16.2 percent manganese, to defendant’s depot at Wenden, Arizona. The check for this shipment, in the amount of $468.81, was dated November 24, 1953, and made payable to “Lentz and McElvany” and mailed to Parker, Arizona. Plaintiff endorsed the check “Lentz and McElvany by Fred Lentz” and deposited it in a bank at Parker, Arizona. Defendant did not receive any protest or comment from plaintiff regarding the form of the checks or the method of handling such payments.
Soon after large scale operations were undertaken, it became apparent that the ore did not contain the percentage of manganese found in the hand picked shipments; in fact, the ore did not meet the required minimum specifications. In *541 order to upgrade the ore to the required percentage, Lentz and McElvany entered into an agreement on November 6,
1953, with Victor J. Morgan. Morgan, who owned and operated a milling plant under the name of Manganese Company of Arizona, agreed to upgrade the ore by increasing its manganese content through a milling process. Lentz and McElvany were to mine the ore and ship it to Morgan’s mill, and Morgan was to mill at least 200 tons of ore per day. After the shipping costs from Morgan’s mill to defendant’s depot were deducted, Morgan was to receive 50 percent of the proceeds.
Plaintiff, contrary to the agreement with Morgan and in the belief that the unmilled ore would meet the required 15 percent minimum of manganese, made shipments directly to the depot at Wenden, bypassing Morgan’s mill. Those shipments of ore failed to measure up to the required minimum percentage of manganese and were rejected by defendant. The cost of removing the rejected ore was prohibitive, and therefore quantities of this ore were left at the depot. Morgan considered that plaintiff’s actions constituted ¡a breach of their agreement and refused to mill any more of the ore if plaintiff was to remain as a party to the venture. Morgan had no objection to a similar agreement if made exclusively with McElvany. At this juncture, early in January 1954, plaintiff, for reasons of health and by oral statement to McElvany, discontinued active participation in the mine in order to return to California. Lentz told McElvany at that time that he was withdrawing from the mining operation and returning to California to resume his former occupation of plumbing. McElvany continued operation of the mine for the purpose of reducing the amount of the debts which had been incurred by the financially unsuccessful venture, as much as possible. To insure defendant’s acceptance of the ore, McElvany shipped it to Morgan’s mill for upgrading. The concentrated ore was then shipped to the depot at Wenden. Lots Nos. 3 and 5 (rejected ore shipped earlier by Lentz) were upgraded to the required minimum percentage by mixing “concentrate” with the rejected lots.
Meanwhile, Morgan and McElvany applied for and received a certificate, No. 9-445, from GSA authorizing par *542 ticipation in the Manganese Program under their j oint names. In late March 1954, McElvany and Morgan offered the recently upgraded ore to GSA under their new certificate. GSA had no detailed knowledge of the circumstances involved in McElvany’s new arrangement with Morgan. The employees of defendant at the Wenden depot were only aware that the upgraded ore had originated at the Black Crow Mine, which was covered by the certificate issued to Lentz and McElvany. Accordingly, they refused to accept shipment under the new certificate. GSA notified McElvany that they would only accept shipment under the old certificate, No. 9-110, originally issued to Lentz and McElvany, and required a release or assignment of any rights, in the ore held and offered by Morgan and McElvany, to Lentz and Mc-Elvany. By adopting this procedure, GSA hoped to preclude any further complications over ownership of the ore. Acquiescing in defendant’s demand, Morgan and McElvany executed a release to Lentz and McElvany, and McElvany changed the acceptance certificate to read “Lentz and Mc-Elvany, P.O. Box 818, El Centro, California.”[1]
After execution of the release, GSA accepted shipments of the upgraded ore, Lots Nos. 3 and 5, totaling 1,289.14 long dry tons containing 15 percent manganese, and issued a check in the amount of $26,097.39, dated May 3, 1954, payable to Lentz and McElvany. The check was mailed to Box 818, El Centro, California. McElvany endorsed the check “Lentz and McElvany, J. L. McElvany” and deposited it in the Bank of America, El Centro, California.
In April 1954, McElvany made a further shipment of concentrated ore, which was processed at Morgan’s mill, to defendant’s depot at Wenden. The shipment consisted of Lots 4, 6, 8, and 10, a total of 978.85 long dry tons, containing 15.1 percent manganese. Defendant issued a check in the amount of $20,013.24, dated May 13, 1954, payable to “Lentz and McElvany”. The check was delivered to McElvany personally. McElvany endorsed the check “Lentz and McElvany, J. L. McElvany, Co-partner” and deposited it in the Bank of America, El Centro, California. This fourth check was *543 the last check issued by defendant on behalf of the mining venture operated by Lentz and McElvany.
The plaintiff bases his claim, in the amount of $266,535.10, on the premise that the defendant received approximately 11,000 tons of manganese ore for which the plaintiff received no payment. Included in this sum is one-half of the amount involved in the last two checks, totaling $46,110.63, which defendant sent to McElvany and were paid on the basis of his personal endorsement.
We now consider plaintiff’s claim that defendant received a substantial quantity of ore for which no payment was made. Plaintiff arrived at his claimed tonnage figure by totaling the truck weight slips kept by the truck drivers on the ore hauled from the Black Crow Mine. The weight slips reflect the truck weight before unloading and after unloading, the difference being the weight of the ore. This ultimate figure is neither acceptable nor necessarily reliable in determining the amounts for which the joint venture is entitled to payment. The ore is not shown to have conformed to the required minimum percentage of manganese, and in fact some of it was rejected by defendant for failure to meet the minimum requirements. Thus, the weight tickets offered by plaintiff as representative of the amount of manganese ore delivered to defendant may not be considered as accurately establishing the weight of the manganese ore finally accepted by defendant. Plaintiff offered some testimony of truck drivers as corroborative of the tonnage indicated by the weight tickets. By such testimony plaintiff seeks to establish acceptance of certain ore by alleging that defendant, without actually sampling the ore to determine whether or not it met the minimum requirements, directed the truck drivers to dump their loads at the stockpile, thereby tacitly accepting such ore. Defendant could not accept any ore and pay for it without an analysis of the sample, and in fact never followed such a policy. The testimony of truck drivers, with particular reference to the length of time the sampling equipment at Wenden was inoperative, necessitating the dumping of ore directly on the stockpile without sampling to see if it met the minimum requirements, is inconclusive, inconsistent, and contrary to the weight of the evidence. The record does not warrant a *544 finding that the sampling equipment was out of operation for a period of more than two and one-half or three days. Plaintiff is clearly in error when he ascribes to the machine mined ore (Lots 3, 4, 5, 6, 8, and 10) the same value as was found in the hand picked ore (Lots 1 and 2), which brought $27 per ton on an average, because of the difference in the percentage of manganese ore obtainable by the two methods of mining. Ore which is hand picked to conform to the highest possible manganese content would obviously contain a much higher manganese percentage than machine mined ore. Lots 1 and 2 were hand picked, whereas Lots 3,4, 5, 6, 8, and 10 were machine mined.
Kegardless of the validity of plaintiff’s computations as to overall tonnage delivered to defendant and the claimed grade of such ore, the record presented, plus the accepted testimony of third party defendant J. L. McElvany and Mrs. McElvany, who kept the books and paid by check the debts of the partnership, is deemed adequate to support a finding that the joint venture has established no valid claim against defendant. If defendant failed to pay Lentz and McElvany for any acceptable ore, McElvany would be entitled to one-half of such payment. This being true, it would be most unusual and surprising for McElvany to deny the existence of any unpaid or outstanding claim against defendant. Since McElvany was required to pay a substantial portion of the debts of the joint venture out. of his own personal funds, it would be advantageous for him to diligently pursue any valid unpaid claim against defendant. In fact, it would appear foolhardy on his part to fail to do so.[2]
The second issue of primary importance is perhaps more of a legal question than one of fact, since it goes to the substance of the relationship between the plaintiff Lentz and the third party defendant McElvany. Making a claim for $23,055.38, or one-half of the last two checks issued to “Lentz and Mc-Elvany” by defendant and endorsed by J. L. McElvany, the plaintiff contends that the defendant negligently paid these checks. It is his contention that McElvany was not author *545 ized to endorse or negotiate the checks in question without plaintiff’s signature.[3] Plaintiff’s position appears wholly inconsistent with his previous conduct in negotiating two checks similarly issued to “Lentz and McElvany” solely on his own signature, and is directly contrary to the express provision in the joint venture agreement that either person could draw on the account for purposes of carrying out the terms of the agreement.
The agreement, by the express language adopted by the parties, is labeled a joint venture. The conduct of the parties coupled with this agreement offers a classic example of a joint venture or adventure. 30 Am. Jur. 937, at 939-942, 952-953, 980-981.[4] One of the elementary rules of the joint venture is that: “Where joint adventurers do work for a third person who pays either or one of them, the payment is a discharge of the obligation as to both or all.” 33 C.J. 874, 48 C.J.S. Joint adventures § 15. The Government, therefore, properly paid the checks, issued to “Lentz and McElvany”, on the endorsement of either one of the parties. After the policy of utilizing the endorsement of checks by a single partner was established by plaintiff, the defendant was not required nor would it be expected to do otherwise than adopt and follow the same procedure with respect to other checks made payable to the joint venturers. In fact, defendant was simply following the provisions of the agreement with respect to endorsement of checks made out to “Lentz and McElvany”.
The agreement between Lentz and McElvany describes the relationship between the parties as a “joint adventure.” In general, a joint adventure (or “venture” as it is often called and as I choose to call it in this instance) has many of the elements of the traditional partnership in that either of the *546 venturers may bind the enterprise by contracts which are within the scope of the business enterprise, and within that scope any one of the parties is authorized to act for the others. The authorities stress the point that co-adventurers are not tenants in common, as are the co-owners of a piece of property. The test is whether there is an association for the carrying on of a business enterprise.
The law of a joint venture has been defined in volume 30, Am. Jur., Joint Adventures, as follows:
§ 2. Definitions. — A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadven-turer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure.
_ § 4. Partnerships. — Admittedly, it is difficult to distinguish between joint adventures and partnerships. The relations of the parties to a joint adventure and the nature of their association are so similar and closely akin to a partnership that it is ordinarily held that their rights, duties, and liabilities are to be tested by rules which are closely analogous to, and substantially the same, if not exactly the same, as those which govern partnerships. From the standpoint of the element of mutual agency of the members of a joint adventure, the relationship has often been said to be akin to that of a partnership or of partnership for a single transaction. In general, however, it is now understood that the two relationships are not identical, and that decisions defining and describing partnerships are not necessarily controlling upon the question whether parties to a particular contract are joint adventurers. In other words, it is not necessary, in order that there be a joint adventure, that a legal partnership exist.
There may be a partnership for a single transaction, but ordinarily a partnership is formed for the transaction of a general business of a particular kind; while *547 a joint adventure is entered into to perform a single transaction of a particular kind, although, it may take a number of years. Because of the limited scope of the relationship between joint adventurers, it is generally more informal than the relationship between partners, and some of the incidents of partnership do not, or at least may not, attach thereto.
In 48 C.J.S., Joint adventures, § 1, the nature of a joint venture is described as follows:
While it has been said that there is no certain, satisfactory, or all-inclusive definition, and that the decisions have not established any fixed or certain boundaries to the legal concept of joint adventure,. as stated in Corpus Juris, which has been quoted and cited in numerous cases, a joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. Numerous similar definitions have been announced by the courts. A joint adventure ordinarily contemplates an enterprise for commercial profit, [p. 801]
H» H»
A joint adventure is distinguishable from joint ownership and tenancy in common in that the latter lacks the feature of adventure. * * * [p. 806]
The relationship between Lentz and McElvany was not merely that of co-holders of shares in a mine. McElvany was not granted an owner’s share in the leasehold by Lentz. McElvany contributed money, equipment and know-how to enable the co-venturers to carry on a business. It seems clearly established that this was a joint venture.
Where two parties who furnished the money and a third party who had considerable experience and knowledge of the oil and gas business and especially in procuring mineral leases acquired oil leases upon the agreement that after repayment of the contributions the three parties would share in the enterprise, and the leases were taken in the names of those who contributed money, there existed a joint adventure.[5] [30 Am. Jur., Joint Adventures, § 19]
*548 Where a joint venture has incurred obligations within the scope of the business enterprise, the cases are agreed that payment by a third person to one co-venturer is payment to all. Thus, in Thacke v. Hernsheim, 115 N.Y.S. 216 at 218, the Court said:
_ As we have seen, the contract under which the plaintiff claims $210 of the $220 for which he sues was a joint venture between plaintiff and Gierth and was completed according to its terms by the plaintiff’s partner in the venture, Carl Gierth, who was paid the balance of the contract price. Payment to Gierth was payment to the plaintiff, Thacke, at least to the extent of the $175 claimed to be due up to the time of the plaintiff’s dismissal, and the defendant is released from liability to the plaintiff at least to that amount. It was not incumbent upon the defendant to determine how much was due to each of the co-contractors, who were partners inter sese, and payment to one was payment to the other. As to the deféndant, either of the joint contractors was the agent of the other in the prosecution of the common enterprise.
In Lake v. Wilson, 183 Ark. 180, 188, 191-192; 35 S.W. 2d 597, 600-601, two attorneys entered into a contract to conduct a lawsuit. A judgment was recovered and the fee paid to one of the attorneys. The other sued the client for his share and the court held that the contract was one of joint venture and payment to one joint venturer discharged the debt. The court said:
Cox and Wilson, having entered into a joint contract, had the right to collect the judgment and enter satisfaction on the record, and since it was a joint contract either Cox or Wilson had this right, and the debtor had a right to pay it to either of them. Mr. Wilson could have collected the money or Mr. Cox could have collected it.
The court referred to 33 C.J. 874,48 C.J.S. Joint adventures, § 15, which reads as follows:
Where joint adventurers do work for a third person who pays either or one of them, the payment is a discharge of the obligation as to both or all.
The court went on to say:
The contract with Cox and Wilson was a joint contract, and the duties and liabilities of each of them was *549 the same as if they had been partners. When a firm of attorneys is employed, or any two or more attorneys employed under a joint contract, the act of any one of the lawyers so employed is binding on all, and either has the right to collect the entire fee. Of course, if either Cox or Wilson collected the entire fee and did not account to the client for it, the one so collecting the fee would be liable to the other party for his portion of the fee. Since either of the attorneys had the right to collect the entire fee and thereby relieve the client of all obligations to the other attorney, when Cox collected the entire fee in this case, he became liable, or would have been liable, to Wilson for Wilson’s portion of the fee, but the client would not have been liable * * *.
In Daily v. Scott, 74 S.W. 2d 881, 889 (Mo.), the court made an exhaustive review of the case relating to j oint venturers. In concluding, it said:
From the foregoing statement of the facts as shown by the evidence, it is our opinion that Matthews, as a joint adventurer with Danforth, was clearly authorized by Danforth, his co-adventurer, to make all collections, and while it is contended by Danforth that statements of his collections were to be forwarded to him, by Matthews, there is no evidence that the respondents had any knowledge of such arrangement between them. Matthews, in making the collections which Danforth says he was authorized to do, relieved respondents from any responsibility so far as the subsequent distribution of the payments were concerned. * * *
The following issues are deemed to be involved in this case:
1. Was the agreement between Lentz and McElvany a joint venture?
2. Were the checks in payment for the ore involved properly made payable to “Lentz and McElvany”?
3. Were the checks properly paid by the bank and defendant, although endorsed by only one of the co-venturers ?
4. Was it proper for the General Services Administration, as the agency representing the defendant, to mail the checks to the address given by McElvany, or to hand them to him personally ?
5. Did the defendant pay in full for all of the ore which was delivered to and accepted by defendant under certificate No. 9-110?
*550 The answer to each, of the foregoing questions, based upon the proof which, has been presented, is in the affirmative.
The lack of a harmonious, cooperative relationship between Lentz and McElvany and the existence of animosity between them, as reflected by the record, plus poor health on the part of both men, is very unfortunate to say the least. There has been extensive litigation in the state courts of California concerning various aspects of their relationship.
Based upon the complete record, it is found that plaintiff has failed to establish entitlement to recover any amount from defendant. The petition should be dismissed.
FINDINGS oe Fact
1. Public Law 96, 82d Cong., 1st Session, Sec. 103, 65 Stat. 133, 50 U.S.C. Appendix Supp. Sec. 2093, amended the National Production Act of 1950 (50 U.S.C. App. Supp. Sec. 2062, et seq.) to give the President authority to make provision for the purchase of metals, minerals and other materials for Government use or resale and for the encouragement of exploration, development, and mining of critical and strategic minerals and metals. By executive order, authority to purchase domestic manganese was delegated to the Administrator of General Services, and on June 27,1952, the General Services Administration issued a regulation (Title 32A, GSA Regulations), which provided in part as follows:
Section 1. Basis and Purpose. This regulation interprets and implements the authority of the Administrator of General Services to purchase manganese ore of domestic origin at Wenden, Arizona, pursuant to delegation of authority from the Defense Materials Procurement Administrator of even date with this regulation, and outlines the attendant responsibilities and functions of the Administrator of General Services in purchasing such manganese ores for Government use and resale. In accordance with the program set forth herein, as authorized by the Defense Production Administration on May 9, 1952, the Administrator will buy domestically produced manganese ore containing not less than fifteen percent (15%) manganese, in accordance with the specifications contained in this regulation. '
Section 2. Definitions. As used in this regulation:
*551 (a) “Administrator” means the Administrator of General Services.
(b) “Program” means the purchase of manganese ore as set forth in this regulation.
(c) “Depot” means the purchase depot of the Government at Wenden, Arizona.
(d) “Manganese ore” means crude ore containing not less than fifteen percent (15%) manganese, mined in the United States, its territories and possessions.
(e) “Long ton unit of manganese” means 22.4 pounds of manganese contained in a long dry ton of manganese ore.
Section 3. Participation in the Program. Any person may participate in the Program by notice given to the General Services Administration Regional Office, 49 Fourth Street, 4th Floor, San Francisco 3, California, in the form of a letter, postcard or telegram postmarked or dated by the telegraph office not later than August 31, 1953. Such notice shall state that the writer desires to participate in the Program and will deliver manganese ore to the depot. Such notice must be signed and a return address given. Any person participating in the Program will promptly be sent a certificate authorizing him to deliver ore meeting minimum specifications.
Section 4. Deliveries. Manganese ore to be purchased by the Government under the Program is to be delivered f.o.b. depot. Delivery of less than five (5) long tons of ore at one time will not be accepted. Participants in the Program must give the Government reasonable notice with respect to deliveries of ore. Each delivery will be sampled and assayed by the Government at the depot and payment on an estimated recovery basis will be made in accordance with the analysis of such sample and as provided in section 6 below. Deliveries not conforming to the minimum specifications will be rejected, and expenses in connection therewith will be borne by the seller.
2. On May 23,1953, the plaintiff, Fred Lentz, leased from B. H. Chisholm, for a period of five years, two mining claims known as Black Crow Nos. 1 and 2 in the Planet Mining District, Yuma County, Arizona. The lease is recorded in the mining records of said county in Docket 76, pp. 517 and 518. On June 11,1953, Fred Lentz, the plaintiff, and J. L. McElvany, the third party defendant herein, entered into a joint venture agreement.
*552 3. The agreement delineated the purpose of the joint venture as the mining and/or milling and selling of manganese ore from two mining locations mentioned in finding 2. Plaintiff obtained the lease and was to devote his time and utilize his prior experience in the operation. The third party defendant was to provide most of the necessary equipment for mining the ore. Each of the partners made a capital contribution of $1,000, which was deposited in a bank at Parker, Arizona, under an account described as “Lentz and McElvany.” Either party could draw on this account for purposes within the scope of the agreement, but neither of the parties had any right to incur any obligation of any nature not directly connected with the business of the joint venture. The parties were not to be considered as partners in the strict interpretation of that term, nor was either one of them to be required to advance any further sum of money. On October 22,1953, plaintiff and the third party defendant entered into a supplement to the joint venture agreement, whereby J. L. McElvany was to receive “bare rental” for his equipment, which was to be made available, used in mining and hauling the ore after July 11,1953. The minimal rental, assessed whether the equipment was used or not, constituted an overhead charge against the mining venture.
4. On June 11, 1953, the plaintiff sent the following letter to the GSA Eegional Office at San Francisco, California :
I wish to participate in the Domestic Manganese Program at Wenden, Arizona, under the joint name of Fred Lentz and J. L. McElvaney.
Please mail the certificate of authorization to us at Parker, Arizona, General Delivery.
5. The parties were not required by defendant to provide defendant with a copy of any agreement delineating the relationship between themselves. It was not the policy of defendant, represented here by GSA, to require the filing of any private agreements which might exist between .the applicants for certificates authorizing participation in the manganese program.
6. On June 18,1953, GSA authorized the parties to deliver manganese to its depot at Wenden, Arizona, by letter as follows:
*553 Your notice dated June 16, 1953, indicating your desire to participate in the Domestic Manganese Program and deliver manganese ore to the Government Materials Purchase Depot at Wenden, Arizona, has been received. You are hereby authorized to deliver to the Government, in accordance with the terms of the program, manganese ore meeting the minimum specifications contained therein. Reasonable notice should be given to the Wenden Materials Purchase Depot with respect to deliveries of ore.
7. The procedure for processing ore offered at the depot at Wenden in accordance with Section 4 of GSA Regulations was substantially as follows:
When a truck drove into the depot it would first be weighed with its cargo of ore. After it was unloaded, the truck would be weighed empty and the difference would represent the wet tonnage of the ore, which includes the atmospheric moisture absorbed. Since payment was based on a long dry ton basis, a sample was baked in an oven for 24 hours to determine the dry weight. Thereafter, samples of the ore were forwarded to the Bureau of Mines at Salt Lake City, Utah, for assay to determine the manganese content. To be acceptable, the ore had to contain a minimum of 15 percent manganese and payments were made on a sliding scale depending on the percentage of manganese contained in the ore. If the assay indicated that the ore had the minimum requirements, an acceptance form was executed by the producer and representatives of the Bureau of Mines and the GSA showing the weight of the ore, the mineral content, and the amount . of the payment made by the Government.
8. On October 26,1953, under certificate No. 9-110, which had been granted to Lentz and McElvany on June 18, 1953, the joint venture shipped 22.35 long dry tons of 30.7 percent manganese to the Wenden, Arizona, depot of the GSA. This ore was hand picked to insure that it contained the minimum . manganese requirement. It was accepted as Lot No. 1. The acceptance form showed the shipment was .made by “Lentz and McElvany, General Delivery, Parker, Arizona” and was signed for Fred Lentz and J. L. McElvany by Fred Lentz as “ Joint Producer”, and showed a net payment of $999.72. On November 9, 1953, a Government check, #22,554,753, in the *554 amount of $999.72, was issued payable to tbe order of “Lentz and McElvany” for Lot No. 1. Tbe check was mailed to plaintiff at Parker, Arizona, and was endorsed by Fred Lentz as follows: “Lentz & McElvany by Fred Lentz”. Tbe check was deposited by plaintiff in the Parker, Arizona, National Bank and paid by the Government. Plaintiff made no protest to the GSA with respect to the form of the check.
i9. On November 9, 1953, under certificate No. 9-110, the joint venture shipped 47.54 long dry tons of 16.2 percent manganese to the Wenden depot. This ore was also hand picked to insure minimum manganese requirements. It was accepted as Lot No. 2. The acceptance form showed the shipment was made by “Lentz and McElvany, General Delivery, Parker, Arizona” and was signed “Fred Lentz and J. L. McElvany by Fred Lentz” as “Joint Producer”, and showed a net payment of $486.81. On November 24,1953, a Government check #22,601,713, in the amount of $486.81, was issued payable to the order of “Lentz and McElvany” for Lot No. 2. The check was mailed to plaintiff at Parker, Arizona, and was endorsed by Fred Lentz as follows: “Lentz and McEl-vany by Fred Lentz”. The check was deposited by plaintiff in the Parker, Arizona, National Bank and paid by the Government. Plaintiff made no protest to the GSA with respect to the form of the check.[6]
10. Once large scale operations were undertaken, it became apparent that the ore did not contain the percentage of manganese found in the hand picked shipments; in fact, it did not meet the required minimum of manganese content required by specifications of defendant. In order to upgrade the ore to the required percentage, Lentz and McElvany entered into an agreement on November 6, 1953, with Victor J. Morgan. Morgan, who owned and operated a milling plant under the name of the Manganese Company of Arizona, agreed to upgrade the ore by increasing its manganese percentage through a milling process, which eliminated impurities and other waste material. By such process a higher percentage of manganese content was obtained. Lentz and McElvany were *555 to mine the ore and ship it to Morgan’s mill. Morgan was to process at least 200 tons of ore per day. After the shipping costs from Morgan’s mill to the Government depot at Wenden were deducted, Morgan was to receive 50 percent of the net proceeds.
11. Plaintiff personally made several shipments directly to the depot at Wenden, by-passing Morgan’s mill. That procedure was adopted by plaintiff without agreement or concurrence by Morgan. The shipments failed to meet the required minimum percentage of manganese and were accordingly rejected by GSA. Since the cost of removing these shipments would have been prohibitive, the ore was left at the Wenden depot. Morgan considered the plaintiff’s actions as a breach of their agreement and refused to mill any more of the ore if plaintiff remained a party to the venture. At this juncture, early in January 1954, the plaintiff, apparently for reasons of poor health and other reasons, advised McElvany that he was witlrdrawing from active participation in the mine with the avowed intention of returning to California to pursue his former occupation in the plumbing business.
12. McElvany assumed the active management of the mining venture and also resumed the milling agreement with Morgan. McElvany stepped up production of the ore and started moving ore to the Morgan mill. After this ore was milled, the concentrate was shipped to Wenden and mixed with Lots Nos. 3 and 5 of the rejected ore, shipped earlier by Lentz, to increase the percentage of manganese to the required minimum content. Meanwhile, Morgan and McEl-vany applied for and received a certificate, No. 9-445, authorizing their participation in the Manganese Program under their joint names.
13. In late March 1954, McElvany and Morgan offered the upgraded ore to GSA under the certificate issued in their joint names. The officials at the Wenden depot were unaware of the circumstances surrounding McElvany’s arrangement with Morgan, but they were aware of the fact that the upgraded ore had originated at the Black Crow Mine, and that a certificate had been originally issued for that mine in the names of Lentz and McElvany. After re *556 fusing to accept shipment under the new certificate, GSA notified McElvany that they would only accept shipment under the old certificate, No. 9-110, which had been previously issued to Lentz and McElvany. They also insisted on an assignment[7] from McElvany and Morgan to Lentz and McElvany of any interest in the ore offered under certificate No. 9-445. Accordingly, the acceptance certificate was changed by McElvany to eliminate the name of Victor Morgan so as to read “Lentz and McElvany”.[8] McElvany gave the mailing address as “P.O. Box 818, El Centro, California.” Neither Lentz nor McElvany had ever given the GSA explicit instructions as to how payment was to be made or where the checks were to be mailed.
14. It appears that in April 1954, Lentz indicated that he did not consider that he had withdrawn from the joint venture as McElvany had believed, and he requested an attorney, J. Hubert Smith of Phoenix, Arizona, to inquire of GSA whether any checks had been made out to McElvany and Morgan. At the end of April 1954, Smith wrote to the Office of the Comptroller on this matter. By letter dated May 3rd, the Chief of the Voucher Examination Section of the GSA Regional Office replied as follows:
Your letters of April 27 and April 29,1954 addressed to Mr. R. E. Reno, Jr., concerning payments for manganese ore delivered by Lentz and McElvany to the Wenden Purchase Depot, have been referred to this office for ■ reply;
Prior to receipt of your letters, this office had suspended payment to Morgan and McElvany for ore that the records indicated had been delivered from the Black *557 Crow Mine in. the name of Lentz and McElvany under Certificate No. 9-110.
We now bold Eelease executed in due legal form by Morgan and McElvany providing that all payments for ore accepted at Wenden from tbe Black Crow Mine located near Bouse, Arizona, be paid to Lentz and Mc-Elvany, holders of Certificate No. 9-110.
Accordingly, all checks in payment for ore accepted from tbe Black Crow Mine will now be drawn payable to Lentz and McElvaney, P.O. Box 818, El Centro, California.
Tbe record does not show that there was any reply to this letter or any objection by plaintiff to tbe sending of the checks to El Centro, California, which was the mailing address given to the Wenden depot by McElvany.
15. After the execution of the “release” by Morgan and McElvany, the upgraded ore was accepted by GSA. The acceptance certificate indicated that Lentz and McElvany were delivering 1,289.14 long dry tons of ore containing 15 percent manganese for a total amount of $26,097.39. The shipment constituted Lots Nos. 3 and 5. A Government check in the amount of $26,097.39, payable to the order of Lentz and McElvany, dated May 3,1954, No. 24,123,981, was mailed to Box 818, El Centro, California, the address set out on the acceptance form. It was endorsed “Lentz & McEl-vany, J. L. McElvany”, deposited in the Bank of America, El Centro, California, and paid by the Government.
16. In April 1954, McElvany made a further shipment of ore to the Wenden depot on behalf of Lentz and McElvany under certificate No. 9-110. The acceptance certificate showed the producer to be “Lentz & McElvany by J. L. McElvany.” The shipment consisted of 978.85 long dry tons containing 15.1 percent manganese for a total of $20,013.24. It consisted of Lots Nos. 4, 6, 8, and 10. A Government check, dated May 13, 1954, in the amount of $20,013.24, was made payable to the order of Lentz & McElvany. At McEl-vany’s request, this check was delivered to him personally. It was endorsed “Lentz & McElvany, J. L. McElvany, Co-partner”, deposited in the Bank of America, El Centro, California, and paid by the Government. This fourth check was the last check issued on behalf of defendant to Lentz and *558 McElvany, or to anyone else, for ore emanating from the Black Crow Mine.
17. Lot No. 7 was rejected by the Wenden depot as not having the required amount of manganese (assay showed only 9.1 percent). It was never upgraded. GSA had no record that a lot No. 9 was ever offered.
18. No deliveries of ore from the Black Crow Mine which met the minimum, specifications were delivered to and accepted by Wendon depot other than Lots Nos. 1, 2, 3, 4, 5, 6, 8, and 10, which were paid for by the four Government checks mentioned above.
19. The proof establishes that the amount of the obligations of the joint venture were in excess of the proceeds of the third and fourth Government checks, in the total amount of $46,110.63, endorsed by J. L. McElvany. The outstanding debts, excluding the “bare rental” agreed upon for equipment owned by McElvany in the supplemental agreement, which were paid by McElvany, are as follows:
(a) The sum of $20,805.31 to Victor J. Morgan pursuant to the terms of the written agreement entered into on November 6, 1953.
(b) The sum of $9,954.91 to various laborers employed by Lentz and McElvany.
(c) The sum of $10,828.42 to outside dump truck operators for hauling ore.
(d) The sum of $4,485.92 for gasoline and oil used in the joint venture.
(e) The sum of $3,028.83 to E. V. Haydis for blasting supplies used in the joint venture.
(f) The sum of $1,187.11 to the Industrial Commission of the State of Arizona for Workmen’s Compensation Insurance.
(g) The sum of $1,904.31 to various companies for necessary parts used in repairing equipment and machinery.
(h) The sum of $779.36 to the State of Arizona for permits to allow J. L. McElvany to bring trucks into the State of Arizona and haul ore for the joint venture.
(i) The sum of $1,600 to Faure Tractor & Equipment Co. for rental of a motor patrol (also described as a grader), used by the joint venture.
*559 (j) The sum of $780 to M. P. McCaffrey for rental of a rooter used by the joint venture.
(k) Tbe sum of $734.50 for lodging of employees of the joint venture at various motels.
(l) The sum of $29.21 to Hartnett Machinery Co. for mining supplies. The sum of $55.08 to Parket Moyor Co. for parts. The sum of $159.84 to B. C. Tackeitt for welding. The sum of $188.91 to W. K. Equipment Co. for rental of equipment and supplies. The sum of $208.65 for testing ore.
The total debts of the joint venture listed herein and paid by J. L. McElvany amounted to $56,670.28.
20. It appears from the proof adduced during the trial of this action that the four checks issued by defendant to “Lentz and McElvany” constituted full and complete payment for all shipments of acceptable manganese ore made by the joint venture from the Black Crow Mines to the depot at Wenden, Arizona,[9] under certificate No. 9-110, issued to Lentz and McElvany.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is dismissed.

 Morgan and McElvany never again attempted to make any shipments under certificate No. 9-445 issued in their joint names.

 Disregarding the “bare rental” attributable to bis own machinery which he never collected, the record indicates that McElvany paid $50,670.28 in extinguishing debts of the joint venture. The Government checks endorsed by McElvany totaled only $46,110.63.

 It is interesting to note on this same issue that the plaintiff instituted a suit in the Superior Court of California, Imperial County, against the Bank of America and J. L. McElvany. On March 12, 1957, the complaint, on'demurrer, was dismissed with prejudice as to the Bank.

 Clearly, McElvany and Lentz were not tenants in common of a mining claim for their distinct business and financial abilities were merged into an association for the carrying on of a business enterprise, i.e., McElvany provided the necessary equipment and Lentz the mining experience, the availability of the leased mine, and the active management of the venture. See 48 C.J.S., sec. 1, pp. 801-802, 806 ; Sample v. Romine, 193 Miss. 706, 8 So. 2d 257, 9 So. 2d 643, 10 So. 2d 346.

 Sample v. Romine, 193 Miss. 706, 8 So. 2d 257, 9 So. 2d 643, 10 So. 2d 346.

 It is significant to note that checks of the joint venture operating account, which were issued for payment on obligations of the joint venture, were signed “Lentz and McElvany”.

 The release executed by McElvany and Morgan reads as follows:
“KNOW ALL MEN BY THESE PRESENTS: That the undersigned Victor J. Morgan, doing business as ‘Manganese Co. of Arizona’, Victor J. Morgan, also known as Victor .Morgan, individually, and J. L. McElvany hereby assign, set-over and transfer unto Lenta and McBlvany all of their right, title and Interest of claim of any nature whatsoever in and to all Black Crow ore or concentrates shipped to the Wenden Materials Purchase Depot at Wenden, Arizona, by Victor Morgan, aka Victor J. Morgan and J. L. McBlvany, whether shipped open or otherwise and including specifically those ores and ore concentrates under No. 9-445 and authorize and direct the General Services Administration to Issue its certificate therefor, and the Offiee of the Comptroller to Issue its voucher in accordance therewith, to wit: in the name of Lentz and McBlvany."

 Morgan and McElvany never made, or attempted to make, another shipment under the certificate, No. 9-445, Issued In their joint names.

 The third party defendant, McElvany, a party to the joint venture agreement, agreed with defendant that full payment has been made for all acceptable ore in which Lentz is shown to have had an interest.