PCI/RCI, a Joint Venture, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–575C.

United States Court of Federal Claims.

Nov. 15, 1996.

Stephen A. Melcher, Minneapolis, MN, for plaintiff.

Miguel A. Serrano, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Leigh Ann Holt, General Services Administration, Denver, CO, of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court after argument on the parties' cross-motions for summary judgment. Plaintiff PCI/RCI, a Joint Venture ("PCI/RCI" or "plaintiff"), consisting of Roers' Construction, Inc. ("RCI"), and Professional Contractors, Inc. ("PCI"), initiated this pre-award action seeking injunctive relief restraining the Government from awarding to any bidder other than plaintiff a contract for a building project. The issue is whether the contracting officer's decision to reject plaintiff's bid because, *inter alia,* the bid was not signed by both co-venturers and

authority was lacking to bind the joint venture was unreasonable or irrational or violated a procurement regulation.

## FACTS

In June 1996 the General Services Administration ("GSA") issued Solicitation No. GS–08P–96–JCC–0005 (the "IFB") seeking bids for a project known as Modernization of the Federal Building/Post Office/Courthouse, Bismarck, North Dakota, Project No. IND96016 (the "Modernization Project"). In August plaintiff responded to the IFB by submitting a bid, bid bond, and certificate of procurement integrity signed by James Roers "Partner" or "Managing Partner." The signature block on the bid, which Mr. Roers signed as "Partner," specified: "Name and Title of Person Authorized To Sign Offer."

Upon opening the bids on August 12, 1996, GSA determined that PCI/RCI's bid was the lowest. The next day GSA telephoned PCI/RCI to advise plaintiff that it was the apparent low bidder. On August 14, 1996, the designated Postaward Contracting Officer, Alison Sullivan, sent PCI/RCI's Don McGuire a letter stating:

It is the Government's policy to recognize the integrity and validity of contractor team arrangements, provided that the arrangements are identified and company relationships are fully disclosed in an offer. Further, concerns bidding on a particular procurement as joint ventures are considered to be affiliated and controlling or having the power to control each other with regard to performance of the contract. In order to determine whether a bona fide affiliation exists, consideration will be given to all appropriate factors, including common ownership, common management, and contractual relationships.

In order to determine whether PCI/RCI was a *bona fide* affiliation, Ms. Sullivan requested PCI/RCI to submit the following information:

1. The delineated responsibilities of each firm to determine the nature of control. This would include information to support who will directly or indirectly be in

control or have the power to control the joint venture. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists. Is there any control through stock ownership?

2. Management information: Who will be the primary point of contact during this contract? Who will have the authority to sign the contract and all modifications? How will decisions be made? Which firm will provide contract administration and management? Which firm will provide the resources (financial, staffing, etc.)? If the responsibility is shared, substantiate the amount of involvement of each firm.

Thus, the thrust of the information sought concerned how the parties would operate the joint venture and how they intended to perform the contract.

On August 19, 1996, PCI/RCI replied through Ron Dosch, Contract Administrator. The letter was sent to Ms. Sullivan on RCI letterhead and stated:

Professional Contractors, Inc. will be the primary point of contact for the contract itself and will also be the responsible entity for the day to day construction requirements of the Project. Mr. Donald McGuire, as President of Professional Contractors, Inc. will have the authority to sign the contract and all modifications thereto. Decisions required throughout the contract period will be forthcoming after consultation between the respective companies. The contract administration and management required for this Project will be mostly done through the personnel resources provided by Roers' Construction, Inc. . . .

PCI/RCI also enclosed a copy of its joint agreement in order to answer the contracting officer's " 'control' " questions. This Joint Bonding Agreement recites that it was entered into on July 28, 1996, for the express purpose of "obtain[ing] a contract with the

General Services Administration . . . for the performance of . . . work" relating to the Modernization Project, including the "submission of such bid and the performance of such construction contract." The Joint Bonding Agreement was designed to define the interests and liabilities of the two corporations in connection with the bid submission. It provides, in pertinent part:

NOW THEREFORE, in consideration of the mutual promise and agreement herein set forth, the parties agree to constitute themselves as joint ventures for the purpose of submitting a bid to [GSA] for the performance of the construction contract . . ., and for the further purpose of performing and completing such construction contract in the event that it is awarded to them on such a [bid], and the parties hereby agree that such bid shall be filed and such construction contract, if awarded to them, shall be performed and completed by them as a Joint Venture. . . .

The Joint Bonding Agreement makes the joint venture subject to specific terms and conditions. It states: "All . . . work shall be performed under the names of the parties or such fictitious names as agreed upon by the parties, and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held jointly in such name." Although the Joint Bonding Agreement designates PCI as the sponsoring joint venturer,[1] none of the terms and conditions listed in the Joint Bonding Agreement restricts either partner's authority to sign a bid or a contract. Furthermore, "[e]ach of the parties agrees to execute all applications and indemnity agreements required by the sureties upon any bond or bonds required in connection with the said bid and contract." The Joint Bonding Agreement is signed by Messrs. McGuire, as President of PCI, and Roers, as President of RCI.

GSA wrote PCI/RCI on August 23, 1996, informing plaintiff that GSA deemed the bid non-responsive. Specifically, the designated

---

[1]. The Joint Bonding Agreement provides that if PCI/RCI were awarded the contract, it

shall be carried out and performed on behalf of the Joint Venture under the direction of the sponsoring joint venturer, acting through such of its officers, employees or agent as it may

hereafter at any time or from time to time designate, and the parties hereto hereby authorize the performance of the construction contract under the direction of the officers, employees and agents of the sponsoring joint venturer so designated.

Preaward Contracting Officer, Ann N. Fleckenstein, noted that the offer, bid bond, and completed certificate of procurement integrity

were signed by only one individual, James P. Roers, as a "partner" or "managing partner." The "Joint Bonding Agreement" that you submitted to delineate the responsibilities and legal obligations of the parties does not indicate that both parties of the joint venture agree to be bound by the contract. Rather, the agreement states that Professional Contractors, Inc. (PCI) is the designated "sponsoring joint venturer" and that the "... construction contract shall be carried out and performed on behalf of the Joint Venture under the direction of the sponsoring joint venturer...." There is nothing in the agreement giving James P. Roers the authority to bind the joint venture or PCI.

Ms. Fleckenstein further stated that Federal Acquisition Regulation ("FAR") § 4.102(d), 48 C.F.R. § 4.102(d) (1996), requires each participant in the joint venture to sign the contract and that although the August 23, 1996 letter

states that Donald McGuire, as President of Professional Contractors, Inc., will have the authority to sign the contract, no such signature was present on the required bid documents. As such, PCI has not indicated its intent to be bound by the terms and conditions of the solicitation.

Responding to Ms. Fleckenstein's concerns, plaintiff's Mr. Dosch on August 26, 1996, sent her a copy of PCI/RCI's "Contractors License" and plaintiff's application for this license, which consists of a Fictitious Partnership Name Certificate. Mr. Dosch wrote the contracting officer that this license

was obtained for Projects such as this so bonding would not become so confusing. Also, enclosed please find the documents pertaining to the license and the process required. Such a license should allow a joint venture to proceed with only one authorized signature, whether that be from PCI or RCI. Unlike a typical joint venture agreement where you are dealing with two companies, two separate licenses, and two separate bonds, this format sought to simplify and consolidate the bid and contract into one entity. Therefore, your interpretation of the need to have two separate signatures (one from each company) is not reasonable....

The Fictitious Partnership Name Certificate lists "PCI/RCI, a Joint Venture," its address, and its purpose and is signed by Messrs. McGuire and Roers. It also designates the relationship between RCI and PCI as a "General Partnership." The Contractors License itself certifies that "PCI/RCI, A JOINT VENTURE ... is entitled to bid on and accept contracts as authorized by law under this license, without limit as to value of any single contract."

Contracting Officer Fleckenstein's August 26, 1996 response characterized plaintiff's letter of that date as a request for reconsideration and amendment of her decision deeming plaintiff's bid nonresponsive. She concluded that the additional "information provided with your letter does not change the initial determination made." Specifically, she stated that "[e]ach participant of the joint venture is required to sign the bid and furnish evidence that one has the authority to bind the other."

Thereafter, by letter of August 27, 1996, again on RCI letterhead, Mr. Dosch advised Contracting Officer Fleckenstein:

James P. Roers is the President and 100% owner of RCI. He is also the Vice President and 50% owner of PCI. He clearly had the authority to bind both companies which he intended to do by signing the bid proposal itself. That is why the joint bonding agreement was executed by each company in the first place so the financial obligations of the parties would be delineated accordingly. We enclose a copy of the By-laws for PCI which document[ ] Jim Roers' authority to bind PCI to any contract.

Although Mr. Roers is the Vice President of PCI, the Bylaws of PCI condition the Vice President's contracting authority on specified events, none of which occurred here. Art. IV, § 6 provides:

In the absence of the President or in the event of his death, inability or refusal to

act, the Vice President shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice President shall perform such other duties as from time to time may be assigned to him by the President or by the Board of Directors.

In fact, the Bylaws do not grant the Vice President any particular contracting power. Art. V, § 1 provides:

The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

Per art. IV, § 5, the President, however, can sign a contract by himself or with any other proper officer of the corporation.

On August 29, 1996, plaintiff's attorney sent Ms. Fleckenstein a letter stating:

1) FAR 4.102(d) sets forth the means of signing the contract after award, stating that "[t]he *contract* shall be signed by each participant in the joint venture in the manner prescribed in paragraphs (a) through (c) above for each type of participant." This regulation sets forth no requirements for the *bid*, however. Therefore, it [cannot] be raised as a requirement [of] bid responsiveness. PCI/RCI will provide all signatures on the contract as well as all other assurances, required by FAR 4.102. This is not an issue of bid responsiveness, however. It concerns the execution of the contract following award.

2) Moreover, none of the Bid Forms contained a requirement that all participants of a joint venture sign the bid indicating the intent of each participant to be bound....

3) Setting aside what the bidding documents required for a responsive bid, if GSA desires an indication of intent to be bound, it received this when the bid was signed by an authorized person on behalf of the joint venture. The signature on behalf of the joint venture binds the partic-

ipants of the joint venturer as a matter of common law. Therefore, when the bid was signed by PCI/RCI, GSA received its indication that all participants of the joint venture intend to be bound. Since then, GSA has received additional information confirming James Roers' authority to bind the joint venture, including the Fictitious Partnership Name Certificate for the joint venture bearing James Roers' signature....

The final letter from GSA was sent on September 3, 1996. In this letter Contracting Officer Fleckenstein restates her reasons for deeming PCI/RCI's bid nonresponsive. She "could not accept [PCI/RCI's] bid as the signature of only one partner to the joint venture on the bid, the bid bond, and the certificate of procurement integrity was not sufficient to bind the joint venture to perform the contract." She concluded that "[a]fter a review of the information provided to date with respect to the joint venture, it is our opinion that the necessary authority to bind the parties to the joint venture cannot be ascertained." Thus, she reaffirmed her decision that plaintiff's bid was nonresponsive.

Subsequent to the final GSA letter, PCI/RCI sent Contracting Officer Fleckenstein supplementary information by letter of September 6, 1996, in an attempt to provide "whatever assurances" the contracting officer required "in order to deem PCI/RCI's bid responsive." Plaintiff's September 6 letter, signed by both Messrs. McGuire and Roers, describes plaintiff as a partnership consisting of RCI and PCI, details the ownership of both partner corporations, and states that Mr. Roers was authorized to sign the bid because: 1) "[PCI] authorized its partner [RCI] to sign the bid and, thereby, bind [PCI] to the bid and the contract which was to be awarded to [plaintiff]"; and 2) "Mr. McGuire, as president of [PCI], also directed Mr. Roers, as vice president of [PCI], to sign the bid." After the onset of litigation, plaintiff also filed the affidavits of Mr. Roers and plaintiff's counsel Mr. Melcher. Because these documents were not reviewed by Ms. Fleckenstein before she made her decision,

the court does not consider them.[2]

## DISCUSSION

■ No express contract between plaintiff and defendant exists. Rather, this pre-award bid protest is based on a breach of an implied contract to consider plaintiff's bid fairly and honestly. *New Am. Shipbuilders v. United States*, 871 F.2d 1077, 1079 (Fed. Cir.1989); *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 375–76 (Fed.Cir.1986); *National Forge Co. v. United States*, 779 F.2d 665, 667 (Fed.Cir.1985). Although the court, pursuant to 28 U.S.C. § 1491(a)(3) (1994), may grant injunctive relief for such a breach, it is available " 'only in extremely limited circumstances.' " *CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)).

■ A breach of the implied contract "occurs ... if the contracting agency acts in an arbitrary and capricious, *i.e.*, irrational or unreasonable, manner in rejecting the bid." *NKF Eng'g*, 805 F.2d at 375; *CACI, Inc.–Fed.*, 719 F.2d at 1573; *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597 (1980). In order to obtain injunctive relief, a frustrated bidder must establish, by a preponderance of the evidence, that the agency's actions 1) were without a rational or reasonable basis, or 2) violated an applicable procurement statute or regulation. *See CACI Field Serve., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam); *National Forge*, 779 F.2d at 668; *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 782–83 (1991) (citing *Tackett & Schaffner, Inc. v. United States*, 224 Ct.Cl. 530, 536, 633 F.2d

940, 942 (1980); *Burroughs Corp.*, 223 Ct.Cl. at 65, 617 F.2d at 597)).

■ "The degree of proof necessary to overturn procurement determinations is related to the amount of discretion vested in the administrative official whose actions are being challenged." *Logicon*, 22 Cl.Ct. at 782 (internal quotations and citations omitted). Procurement in the present case was conducted in the context of formally advertised bidding, not through negotiation. As a consequence, the burden of showing an abuse of discretion is not as heavy in this case as in cases of negotiated procurement. *See Burroughs*, 223 Ct.Cl. at 65, 617 F.2d at 597 ("Because of ... the breadth of discretion ... in negotiated procurement, the burden of showing this discretion was abused ... is certainly much heavier than it would be in a case of formal advertising."); *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1204 (1974) ("[T]he degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations."); *see also* Richard J. Bedner *et al.*, *Construction Contracting* 314 (1991) (discussing burdens).

This court must review liberally the contracting officer's four decisions in order to discern the objections voiced by the contracting officer[3] in the correspondence that constituted her determination that plaintiff's bid was nonresponsive. The court's undertaking is not an easy one. This is due in part to the ambiguity created by defendant's recharacterization of events post-suit and the erroneous requirement for signatures by both co-

---

**2.** Although the court is not considering these documents, the Federal Circuit and the Comptroller General have allowed litigation affidavits, similar to those in the present case, submitted by a joint venture to serve as evidence of authority. *See Sadelmi Joint Venture v. Dalton*, 5 F.3d 510, 513 (Fed.Cir.1993) (upholding authority of one co-venturer to sign certificate based on affidavits of each co-venturer stating signatory's authority and law governing joint ventures); *Matter of: W.G. Yates & Sons Constr. Co.*, 92-2 CPD ¶ 97 (finding sufficient authorization of one co-venturer on certificate of procurement integrity where affidavit described nature of joint venture, explained reason for bidding as joint venture, and stated co-venturer had authority).

**3.** Defendant takes the position that all four letters should be considered as the contracting officer's decision. The two contracting officers who issued these letters served different functions. Contracting Officer Fleckenstein was the Pre-award Contracting Officer, and Contracting Officer Sullivan was the Postaward Contracting Officer. This functional difference might explain why Ms. Sullivan's initial letter of August 14, 1996, did not cite defects in the bid and why Ms. Fleckenstein's subsequent letters did. Although these two officers issued the decision, the court refers to "contracting officer" in the singular.

venturers that the contracting officer cited in her last three letters.[4]

The record reveals that the contracting officer's determination is based on the following:

1. Concern whether a *bona fide* affiliation between PCI and RCI exists, *see* Letter of Aug. 14, 1996;

2. "FAR 4.102(d) states that the contract shall be signed by each participant in the joint venture." Although the joint venture stated that Mr. McGuire had authority to sign the contract, "no such signature was present on the required bid documents," Letter of Aug. 23, 1996; "Each participant in the joint venture is required to sign the bid and furnish evidence that one has the authority to bind the other," Letter of Aug. 26, 1996;

3. The "[s]ignature of only one partner to the joint venture on the bid, bid bond, and the certificate of procurement integrity was not sufficient to bind the joint venture to perform the contract," Letter of Sept. 3, 1996; and

4. The "necessary authority to bind the parties to the joint venture cannot be ascertained." *Id.*

1. *Whether plaintiff is a bona fide joint venture*

 Upon receipt of the bid, Contracting Officer Sullivan on August 14, 1996, wrote PCI/RCI asking for additional information in order to determine the "validity and integrity of [the] contractor team arrangements." The contracting officer has authority to require a joint venture to demonstrate that its "contractor team arrange-

ment" truly is a joint venture; *i.e.,* "an association of persons by way of contract to engage in and carry out a single business adventure for joint profit, combining their efforts, property, money, skill and knowledge without creating a partnership or a corporation.'" *Sadelmi Joint Venture v. Dalton,* 5 F.3d 510, 513 (Fed.Cir.1993) (quoting *Lentz v. United States,* 171 Ct.Cl. 537, 545, 346 F.2d 570, 575 (1965)); *see Matter of: J.W. Bateson Co.,* 77-2 CPD ¶ 472. In response to the contracting officer's query, plaintiff submitted its Joint Bonding Agreement, which discusses the liabilities and interests of each partner to the joint venture, including profit sharing, resources, and management responsibilities. The Joint Bonding Agreement defines the purpose of this joint venture as "submitting a bid to [GSA] for the performance of the [Modernization Project]."[5] Further substantiation of the PCI/RCI affiliation came in response to subsequent inquiries. For example, plaintiff submitted its Contractors License enabling it "to bid on and accept contracts" and its Fictitious Partnership Name Certificate describing the nature of the parties' relationship as a "general partnership." During argument on the summary judgment motion, defendant stated that it did not challenge plaintiff's status as a joint venture.

2. *Whether the FAR require each member of a joint venture to sign the bid*

1) *Legal consequences of forming a joint venture*

 The legal consequences of forming a joint venture are "similar to those of a partnership." *Sadelmi,* 5 F.3d at 513 (citing *Pine Prods. Corp. v. United States,* 945 F.2d

---

4. During the September 23, 1996 hearing to discuss plaintiff's application for a temporary restraining order, the court noted the initial, erroneous reliance of the contracting officer on FAR § 4.102(d). Transcript of Proceedings, *PCI/RCI, a Joint Venture v. United States,* No. 96–575C (Fed.Cl. Sept. 23, 1996), at 11–12. Defendant did not mention the FAR provision in its motion for summary judgment. Rather, defendant recharacterized plaintiff's argument as an attempt to supply a required signature after the sealed bid's opening.

5. In her August 23, 1996 letter, Contracting Officer Fleckenstein states that the Joint Bonding

Agreement "does not indicate that both parties of the joint venture agree to be bound by the contract." The court is puzzled by this finding. Indeed, the entire purpose of the Joint Bonding Agreement signed on behalf of PCI and RCI by their authorized representatives was to delineate the responsibilities, liabilities, and interests of the partners if awarded the Modernization Project. In that event, breach by either PCI or RCI would give rise to a cause of action in the other. The Joint Bonding Agreement and the bid once accepted are binding upon PCI and RCI; the parties manifested an intent to be bound.

1555, 1560 (Fed.Cir.1991); *Gramercy Equities Corp. v. Dumont,* 72 N.Y.2d 560, 531 N.E.2d 629, 534 N.Y.S.2d 908 (1988)). The concepts are linked so inextricably that a joint venture is often referred to as a "partnership for a limited purpose." *Id.; see* 46 Am.Jur.2d *Joint Ventures* § 1 (1994).

█ "The general rule is that each member of a joint venture has the authority to act for and bind the enterprise, absent agreement to the contrary." *Sadelmi,* 5 F.3d at 513; *see* Alan R. Bromberg & Larry R. Ribstein, *Bromberg & Ribstein* on Partnership 192 (Supp.1995) (citing § 301 of Revised Uniform Partnership Act and noting each partner is agent of partnership).

In general, a joint [venture] . . . has many of the elements of the traditional partnership in that either of the venturers may bind the enterprise by contracts which are within the scope of the business enterprise and within that scope any one of the parties is authorized to act for the others.

*Sadelmi,* 5 F.3d at 513 (quoting *Lentz,* 171 Ct.Cl. at 545–46, 346 F.2d at 575). Applying this rule in a government contract setting, one partner has authority to sign a bid on behalf of the joint venture, unless an agreement to the contrary exists. Defendant agreed during the summary judgment argument that the contracting officer should be charged with knowledge of this general principle. In fact, it appears that Contracting Officer Sullivan recognized it in her August 14, 1996 letter, which stated: "Further, concerns bidding on a particular procurement as joint ventures are considered to be affiliated and controlling or having the power to control each other with regard to performance of the contract."

#### 2) *Requirements of applicable regulations*

Defendant notes that the present case involves sealed bidding and asserts that in sealed bid procurements a contract results "upon acceptance or award by the [contracting officer]." *McMaster Constr. Inc. v. United States,* 23 Cl.Ct. 679, 684 (1991). According to defendant, in the sealed bidding context the bid metamorphoses into the contract when the contracting officer signs the bid; therefore, the bid must comply with the requirements of FAR § 4.102(d) describing the signatures required for a contract. At the same time, however, defendant allows that furnishing sufficient proof of authority to sign the bid satisfies the signature requirement.

█ FAR § 4.102(d) states: "The contract [with joint venturers] shall be signed by each participant in the joint venture. . . ." A contract is not formed, however, until the Government makes an award. *John C. Grimberg Co.,* 702 F.2d at 1367. Therefore, when the bidder submits its bid, a contract does not exist; the bid and contract are distinct. The Comptroller General has upheld this distinction and, in reviewing FAR § 4.102, has stated: "[A]n offer in the form of a bid is not a contract." *Matter of: IBI Security Serv., Inc.,* 84–2 CPD ¶ 118 (examining bid in light of FAR § 4.102(c), which describes how corporate bids shall be signed). Because FAR § 4.102(d) is inapplicable to the case at bar, the contracting officer's assertion to the contrary was at least inconsistent with the clear meaning of this procurement regulation.

█ Nothing in the IFB explicitly requires that a bid submitted by a joint venture be signed by each partner of the joint venture. *See Bateson,* 77–2 CPD ¶ 472. The disappointed bidder in *Bateson* protested GSA's decision to award the contract to a joint venture on the ground that only one participant of the joint venture signed the bid. Rejecting this argument, the Comptroller General stated: "Regarding Bateson's contentions concerning the absence of signatures on the bid by each of the members of the joint venture, we know of *no requirement that all members of a joint venture sign a bid." Id.* (emphasis added). As plaintiff correctly notes:

If GSA intended that a joint venture execute its bid in this fashion, it could have easily set forth this requirement in these various sets of instructions and supplementary instructions. Having failed to do so, GSA cannot reject a bid which complies with the IFB on the basis of some factor that has not been specified. . . .

Plf's Br. filed Oct. 18, 1996, at 9. Defendant, however, argues that FAR § 4.102(d) was specified as it became a part of the bid by implication.

When evaluating bids, an agency is prohibited from considering factors that are not specified in the solicitation. 41 U.S.C. § 253b(a) (1994) ("An executive agency shall evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation."). This prohibition was recognized by the IFB's incorporation of FAR § 52.214–19, which states:

> The Government will evaluate bids in response to this solicitation without discussions and will award a contract to the responsible bidder whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only price and the price-related factors specified elsewhere in the solicitation.

During the summary judgment argument, defendant noted that the IFB also incorporated FAR § 14.301(d), which provides:

> Bids should be filled out, executed, and submitted in accordance with the instructions in the invitation. If a bidder uses its own bid form or a letter to submit a bid, the bid may be considered only if (1) the bidder accepts all the terms and conditions of the invitation and (2) award on the bid would result in a binding contract with terms and conditions that do not vary from the terms and conditions of the invitation.

Defendant contends that FAR § 14.301(d)(2) requires a bid to be completed such that, if accepted, a binding contract results; consequently, a bid by a joint venture must be completed in accordance with FAR § 4.102. Defendant essentially argues that the IFB incorporates FAR § 14.301 and therefore that FAR § 4.102 is incorporated by implication. Under defendant's approach Contracting Officer Fleckenstein's August 23, 1996 letter did not state an erroneous premise because FAR § 4.102(d) is applicable to the present case and requires all partners to the joint venture to sign the bid.

Putting aside the fact that the bid form provided for only one signature, defendant's incorporation-by-implication argument violates the policy of strict construction and integrity of the sealed bidding process. Sealed bidding requirements are detailed and as such are strictly construed. *See Elcon Enter., Inc. v. Washington Metro. Area Transit Auth.,* 977 F.2d 1472, 1483, 298 U.S.App.D.C. 197, 208 (1992); *see also Toyo Menka Kaisha Ltd. v. United States,* 220 Ct.Cl. 210, 218–19, 597 F.2d 1371, 1376–77 (1979) (discussing how sealed bids that do not conform to IFB must be rejected). To allow defendant to add, explicitly or implicitly, a requirement to the IFB at this date violates the integrity of the sealed bidding process; bidders cannot be held subject to an unpublicized requirement.

Additionally, the contracting officer's decision letters undermine defendant's reliance on FAR § 4.102(d). In Contracting Officer Sullivan's August 14, 1996 letter, she queried: "Who will have the authority to sign the contract and all modifications?" The contracting officer implies that a contract exists and must be signed, not that the bid was the contract. If the latter were true, the contracting officer's question would constitute pure gamesmanship. Plaintiff cannot be "caught" by allocating the task of signing modifications and the contract to Mr. McGuire, because joint ventures may delegate duties, responsibilities, and liabilities. *See Sadelmi,* 5 F.3d at 513 ("Joint ventures may allocate the tasks of the venture."). In fact, plaintiff's joint venture agreement specifically provides for such a designation. It states:

> The parties hereto hereby designate [PCI] as the sponsoring joint venturer and the construction contract shall be carried out and performed on behalf of the Joint Venture under the direction of the sponsoring joint venturer, acting through such of its officers, employees or agent *as it may hereafter at any time or from time to time designate....*

(Emphasis added.) Plaintiff's designation of an agent for a particular purpose does not alter the general rule allowing one co-venturer to bind another. *Sadelmi,* 5 F.3d at 513.

The Federal Circuit has adopted the rule that, absent an explicit restriction of authori-

ty, any member of the joint venture has signatory authority and may bind the partnership. *Sadelmi,* 5 F.3d at 511, 513. Sadelmi Cogepi, S.p.A., an Italian corporation, and Sadelmi New York, Inc., formed a joint venture, Sadelmi JV. The joint venture agreement provided that all decisions would be made by a three-member Management Committee, only two of which, one person from each member corporation, had voting rights. "All decisions were to be by agreement of the two voting members, with any differences to be decided by an official of the General Electric Company." *Id.* at 511. In the course of contract performance, several certified claims were submitted to the contracting officer. "The certification was executed 'Sadelmi Joint Venture, by [signature] Giorgio Orsi'." *Id.* at 513. The Government contended that the certification[6] must be signed by both voting members of the Management Committee. On appeal the Federal Circuit explained:

> That only [one member] signed the contract for the joint venture is in accord with joint venture law. The Sadelmi Joint Venture Agreement did not prohibit such action by a joint venture partner. Compare *Kiewit/Tulsa–Houston v. United States,* 981 F.2d 531 (Fed.Cir.1992), wherein the joint venture agreement was explicit in providing that neither partner had authority to bind the joint venture. The Sadelmi joint venture's Management Committee, upon which the government places great emphasis, indeed set the rules of administration of the venture by agreement of the partners; but this did not divest the partners of their authority and responsibility to conduct the business of the joint venture.

*Id.* at 513. In *Sadelmi,* despite the joint venture's agreement requiring agreement by two members, only one member needed to sign a document to bind the joint venture. The parties' own agreement did not override the general rule of joint venture law providing for signatory authority.

Rephrasing her concern in her August 26, 1996 letter, Contracting Officer Fleckenstein

no longer relies on FAR § 4.102(d), but states, "each participant [of the joint venture] is required to sign the bid. . . ." The Comptroller General, however, expressly rejected such a requirement in *Bateson,* 77–2 CPD ¶ 472. Defendant concedes this point and states: "The holding cited in *J.W. Bateson Co.,* B–189848, 77–[2] CPD 472 (Dec. 16, 1977), clearly states that all members of a joint venture are not required to sign a bid." Def's Br. filed Oct. 29, 1996, at 4.

The law of joint ventures evolved with partnership law and was designed to facilitate commercial transactions and contracts. *See generally* 46 Am.Jur.2d *Joint Ventures* §§ 1–5 (1994 & Supp.1996) (discussing development of joint venture law and its similarities to partnership law). PCI and RCI obtained the Fictitious Partnership Name Certificate and Contractors License in order to make the submission of bids and signing of contracts easier. Moreover, the North Dakota statute allowing PCI/RCI to obtain a license was promulgated for this same purpose. *See* N.D.Cent.Code § 45–06–01.1; N.D.Cent.Code §§ 10–19.1–01 to 10–19.1–59 (1995). By forcing joint ventures to obtain the signatures of every member and by holding joint ventures to such a stringent requirement, the contracting officer's approach defeats the very purpose behind the creation of joint ventures. The court does not hold that federal procurement law must parallel the common law approach to joint ventures. If an applicable procurement regulation were more stringent, the contracting officer could apply it. However, no such procurement regulation exists, and therefore it is not reasonable for the contracting officer *sua sponte* to require the signature of both co-venturers.

3. *Whether Mr. Roers, as a co-venturer, could bind the joint venture on the bid, bid bond, and certificate of procurement integrity*

1) *The bid*

 The contracting officer questioned whether Mr. Roers' authority can be

---

6. The court recognizes that the issue in the present case differs from that in *Sadelmi.* The certification requirement, however, "goes to the very 'integrity of the federal procurement system and the public fisc.'" *Kiewit/Tulsa–Houston v. Unit-* *ed States,* 981 F.2d 531, 533 (Fed.Cir.1992) (quoting *Universal Canvas, Inc. v. Stone,* 975 F.2d 847, 850 (Fed.Cir.1992)). The case therefore offers appropriate guidance.

ascertained from the documents submitted. Whether a signatory has sufficient authority to bind a bidder is a "determination to be made by the contracting officer upon consideration of all relevant evidence." *Matter of: Aamtech, Int'l Factors Corp.,* 82–1 CPD ¶ 280; *see In the Matter of General Ship and Engine Works, Inc.,* 55 Comp.Gen. 422, 426 (1975); *In the Matter of Atlantic Maintenance Co.,* 54 Comp.Gen. 686, 692 (1975); *Matter of: Jordan Contracting Co. and Griffin Constr. Co.,* 76–2 CPD ¶ 250; *Bateson,* 77–2 CPD ¶ 472. Thus, the contracting officer may request verification of authority. The bidder has the burden of establishing authority of the signatory on the bid. *In the Matter of Forest Scientific, Inc.,* 58 Comp. Gen. 276 (1979); *Matter of: AUL Instruments, Inc.,* 81–1 CPD ¶ 31. Evidence of such signatory authority may be submitted after bid opening. *See Firth Constr. Co. v. United States,* 36 Fed.Cl. 268, 272 (1996); *McMaster,* 23 Cl.Ct. at 684; *Matter of: Gammon Technical Prods., Inc.,* 94–1 CPD ¶ 370; *Matter of: Southwest Maintenance Serv.,* 94–2 CPD ¶ 243. "Evidence is not necessarily limited to documents, and authority *may be inferred* from the position held by the signor or by knowledge obtained by other means." *Aamtech,* 82–1 CPD ¶ 280 (emphasis added); *see Self-Powered Lighting, Ltd.,* 59 Comp.Gen. 298, 309–10 (1980). If the bidder fails to present sufficient evidence "to prove to the contracting officer's satisfaction the authority of the [signor to bind the bidder] . . ., the agency may properly reject the bid." *Aamtech,* 82–1 CPD ¶ 280; *see Forest,* 58 Comp.Gen. at 279.

 Although the contracting officer has discretion in assessing whether authority to sign has been substantiated, the contracting officer must exercise that discretion with a basic familiarity with the law of joint ventures. One co-venturer can bind another to a bid by operation of law, assuming that information establishing that the joint venture is *bona fide* and information identifying the signatory are before the contracting officer.

 Defendant acknowledges that the Comptroller General in *Bateson* rejected the proposition that each co-venturer must sign the bid. Nevertheless, defendant relies on *Bateson* for the showing of authority to sign a bid on behalf of a joint venture: "Unlike the *Bateson* case . . . the signature of James P. Roers could not bind the joint venture because he had not received authority from the PCI's board of directors pursuant to its bylaws." *Id.* at 4–5. As in this case, the individual signing on behalf of the joint venture in *Bateson* did not receive authority from the board of directors of each of the companies constituting the joint venture. The contracting officer in *Bateson* was confronted with a bid signed by one officer as "Vice President" of one company of a three-party joint venture. The bid did not reveal whether the signature was meant to bind the company that employed the signatory as Vice President or all three members of the joint venture. However, submitted with the bid in *Bateson* was a power of attorney signed by an official of each of the co-venturers specifically authorizing the signatory to execute the bid on behalf of the joint venture. The power of attorney persuaded the contracting officer that the signatory had the requisite authority to bind the joint venture.

 A power of attorney designating Mr. Roers as an agent of the joint venture with signatory authority was not necessary in the case at bar. First, Mr. Roers was not a stranger to the transaction. He signed as "Partner" of PCI/RCI. The Joint Bonding Agreement, Fictitious Partnership Name Certificate, and Contractors License all identify Mr. Roers' position as RCI's President and his relationship to the joint venture. Therefore, the contracting officer's search for a document expressly granting authority should have been satisfied. A power of attorney, or other evidence establishing signatory authority, is required only when the signatory is a stranger to the transaction, or where his capacity is not indicated clearly. *See Bateson,* 77–2 CPD ¶ 472 (upholding bid where signatory signed as "Vice President"); *Atlantic,* 54 Comp.Gen. 686 (finding adequate certification by corporate secretary under corporate seal, submitted with bid, stating signatory was corporate treasurer when he signed bid). Mr. Roers' identity and authority can be ascertained readily by a review of

the documents submitted to the contracting officer before the last decision letter issued.

### 2) *The bid bond*

██ Even though only Mr. Roers signed the bid bond as "Partner" of PCI/RCI, the evidence demonstrates that the Government is protected by the bid as submitted. *See Bateson,* 77–2 CPD ¶ 472. The bid bond ensures that the parties are bound. "When a bid bond is alleged to be defective, however, the determinative issue is whether the surety has sufficiently manifested an intention to be bound under the IFB so that the bid bond would be enforceable by the government in the event of a default by the contractor." *Matter of: Todd's Clearing and Grading,* 92–1 CPD ¶ 56; *Matter of: Joseph B. Fay Co.,* 91–1 CPD ¶ 234; *Bateson,* 77–2 CPD ¶ 472. Whether a bid bond is acceptable depends upon the circumstances. *Matter of: Kirila Contractors, Inc.,* 67 Comp. Gen. 455 (1988).

The facts of the instant case are similar to those in *To Mr. Charles C. Campbell,* B–152589 (Oct. 18, 1962). A partnership consisting of two partners submitted a bid, but only one partner signed the face of the bid bond. The Comptroller General found:

> [T]he partnership as principal, acting in the ordinary course of its business, has contracted with a surety to undertake an obligation to the partnership to hold the government harmless in the event the company refuses to execute this particular contract and the government will be able to enforce this obligation. *Goerig v. Continental Casualty Co.,* 167 F.2d 930. Indeed, we think the surety could enforce an indemnification agreement against the partner who did not join in the execution of the bond. *Seaboard Surety Co. v. H. and R. Construction Corporation,* 153 F.Supp. 641.

*Id.* On this basis the Comptroller General in *Campbell* determined that the interests of the Government were not prejudiced and the bid was responsive.

In the instant case, the joint venture acting in the ordinary course of business contracted with a surety to hold the Government blameless in the event of default. The surety is liable notwithstanding that only Mr. Roers signed the bid bond. *General Ship and Engine Works,* 55 Comp.Gen. at 424–25; *see* 72 C.J.S. *Principal and Surety* § 24 (1987). The Government will be able to enforce the obligation, and the surety could enforce an indemnification agreement against co-venturer PCI. Consequently, the sole signature on the bid bond did not render the bid nonresponsive.

### 3) *The Certificate of Procurement Integrity*

██ Similarly, the signature of only Mr. Roers signing as Partner of PCI/RCI on the certificate of procurement integrity does not render the bid nonresponsive. *Matter of: Tri–Ark Indus., Inc.,* 96–1 CPD ¶ 194; *Yates,* 92–2 CPD ¶ 97. So long as the individual signing the certificate has the authority to bind the bidder, the bid is responsive. *Southwest Maintenance,* 94–2 CPD ¶ 243; *Matter of: Hutchinson Contracting,* 93–1 CPD ¶ 391. For example, in *Hutchinson,* the Comptroller General found a bid responsive where one individual signed the bid and another signed the certificate of procurement integrity. The individual signing the certificate was the president of the company, "and was thus authorized to sign the certificate and bind the bidder." *Id.* ¶ 391. Likewise, in the present case, Mr. Roers as an authorized agent of RCI could bind the joint venture consisting of PCI and RCI. Consequently, the failure of one member to sign the certificate does not render the bid nonresponsive.

### 4. *Whether the necessary authority to bind the joint venture can be ascertained; whether PCI's Bylaws support the contracting officer's decision*

██ Plaintiff submitted PCI's Bylaws, and defendant examines Mr. Roers' authority under them. Defendant argues that "plaintiff has failed to produce any evidence which demonstrates Mr. Roers had authority to bind PCI in accordance with the by-laws of PCI." Def's Br. filed Oct 4, 1996, at 6. Defendant correctly notes that, under PCI's Bylaws, only the President of PCI can sign contracts and that the President does not have the power to delegate signatory authori-

ty.[7] Therefore, defendant concludes that the bid must be signed by PCI's President. Confusion abounds because Mr. Roers is Vice President of PCI. Defendant analyzes the authority of the Vice President and finds that the Vice President does not have signatory authority.

Carrying defendant's argument to its logical extreme, every time a bid is submitted by a joint venture created between two corporations, each corporation's bylaws must be produced and analyzed. This procedure has not been used in any reported case. In fact, this procedure was not used in the present case. As defendant acknowledged during the summary judgment argument, the contracting officer never questioned Mr. Roers' signatory authority for RCI, nor were RCI's Bylaws produced.

Defendant's reasoning is flawed because Mr. Roers derives his authority from the joint venture, not from PCI's Bylaws. The Bylaws govern the administration and internal operating procedure of PCI. Mr. Roers signed the bid as Partner of PCI/RCI in his capacity as President of RCI. Mr. McGuire signed the Joint Bonding Agreement as President of PCI. Defendant agrees that the Bylaws do not limit the authority of PCI's President to enter into a joint venture,[8] nor do they divest PCI of its "authority and responsibility to conduct the business of the joint venture." *See Sadelmi*, 5 F.3d at 513; *see also* Uniform Partnership Act (1994) (U.L.A.) §§ 301–05; Uniform Partnership Act (1914) (U.L.A.) § 9; N.D.Cent.Code 10–19.1–01 to 10–19.1–59 (1995). When Mr. Roers signed the bid, the contracting officer requested information to ensure that the affiliation was a *bona fide* joint venture and asked plaintiff who had authority to sign the contract. In response plaintiff submitted a

copy of the Joint Bonding Agreement. This agreement outlined each individual partner's responsibilities in the joint venture, did not list any restrictions of authority, and allowed for the delegation of signatory authority for the contract to Mr. McGuire. The contracting officer was still concerned and queried that nothing evidenced Mr. Roers' authority to bind the joint venture or PCI or the intent by both parties to be bound to the contract. Thereafter, plaintiff submitted its Fictitious Partnership Name Certificate and the Contractors License. These documents were signed by Messrs. Roers as President of RCI and McGuire as President of PCI.

At this point the contracting officer had proof, signed by the presidents of PCI and RCI, that 1) the parties intended to be bound, not only to the Joint Bonding Agreement, but to the bid itself; 2) plaintiff was a *bona fide* joint venture under North Dakota law and was doing business as a "General Partnership;" and 3) plaintiff had an actual license "to bid on and accept contracts as authorized by law." Based on this information, the contracting officer should have concluded that Mr. Roers had authority to bind the joint venture to the bid. In these circumstances the continued finding of nonresponsiveness was unreasonable.

The quantity and quality of evidence submitted in this case are striking in comparison to the standards that the Comptroller General has used in overturning a contracting officer's determination of nonresponsiveness. In *Aamtech*, 82–1 CPD ¶ 280, Aamtech International Corporation protested the award of a contract to any bidder other than Commonwealth Steel Company Ltd. ("Commonwealth"). The contracting officer had determined that the bids were not signed by

[7]. In an effort to convince Contracting Officer Fleckenstein that Mr. Roers was authorized to sign on behalf of PCI, irrespective of the joint venture, plaintiff argued in its August 27, 1996 letter (and in its post-decision September 6, 1996 letter and before the court) that PCI's Bylaws authorized Mr. Roers to sign on behalf of PCI. Plaintiff points out that the North Dakota Business Corporation Act overrides all corporate bylaws to the extent that they are inconsistent with the Act and specifically authorizes the officers of a corporation to delegate duties and powers to other persons without the approval of the board.

*See* N.D.Cent.Code §§ 10–19.1–04; 10–19.1–31; 10–19.1–59 (1995). The court agrees with defendant that the contracting officer is not expected to be versed in the particulars of North Dakota statutes. Consequently, the court does not consider the statutes' provisions determinative.

[8]. During the summary judgment argument, defendant agreed that PCI validly entered into the joint venture and that Mr. McGuire had the authority to sign the Joint Bonding Agreement.

an authorized representative of Commonwealth. The bids submitted were signed by " 'G.F. Argetsinger, authorized representative.' A business card was attached to each bid, bearing the inscription, 'Aamtech International Factors Corporation, G.F. Argetsinger, President & Managing Director.' " *Id.* The contracting officer requested information demonstrating Mr. Argetsinger's agency relationship with Commonwealth. In response Mr. Argetsinger furnished a letter on Commonwealth stationary stating that "Aamtech ... is authorized to present our offers ... For: Commonwealth Steal Company Limited, Manager Corporate Finance and Company Secretary." *Id.* The contracting officer determined that an agency relationship for Mr. Argetsinger was not established. Concluding that the contracting agency incorrectly deemed the bids nonresponsive, the Comptroller General stated:

> First, the agency does not question Mr. Argetsinger's authority to bind Aamtech, as its President and Managing Director. Second, the attachment of the business cards to the bids showing Mr. Argetsinger's position with Aamtech Corporation, despite the lack of comment or explanation, demonstrates the involvement of Aamtech. Third, the Commonwealth corporation is bound by the signature of authorized officers. Finally, the submission by Mr. Argetsinger of the Commonwealth authorization, which indicated the actual relationships involved occurred prior to any awards being made.

*Id.*

As in *Aamtech,* the present contracting officer did not question the signatory's authority to bind the corporation of which he is president. RCI is a corporation and a corporation is bound by the signatures of its authorized officers. The Joint Bonding Agreement, Fictitious Partnership Name Certificate, and Contractors License demonstrate that PCI/RCI is a joint venture consisting of PCI and RCI and fully describe the relationship. In such a relationship, the signature of one of the organization's members binds the entire organization. *Sadelmi,* 5 F.3d at 513; *Lentz,* 171 Ct.Cl. at 545, 346 F.2d at 575; Bromberg & Ribstein, *su-*

*pra,* § 2.04(e); Annotation, 60 A.L.R. 917 (1958); Armstrong, *Can Corporations Be Partners?,* 20 Bus.Law. 849 (1965); Note, *The Corporate Partner: An Exercise in Semantics,* 35 N.Y.U.L.Rev. 548 (1960); Scott Rowley, *The Corporate Partner,* 14 Minn. L.Rev. 769 (1930). Thus, when RCI's authorized agent signed the bid as "Partner" for the joint venture, the joint venture was bound. *See Sadelmi,* 5 F.3d at 513; *Aamtech,* 82-1 CPD ¶ 280; Uniform Partnership Act (1994) (U.L.A.) §§ 301-05; Uniform Partnership Act (1914) (U.L.A.) § 9.

Instead of a business card—which could be printed at any standard stationery store without submitting proof of authority—the contracting officer here had legal documents previously examined and accepted, and one issued, by the State of North Dakota. Instead of a generic letter printed on letterhead as in *Aamtech,* the contracting officer had the actual "agreement among" the parties to the joint venture, evidencing PCI's and RCI's intent to be bound. Instead of the generic letter, the contracting officer had a document that created legal rights in the United States as a third-party beneficiary. *See Restatement (Second) of Contracts* (1979).

During the summary judgment argument, the court asked defendant what would have appropriately demonstrated Mr. Roers' authority. Defendant replied:

1) a Joint Bonding Agreement that did not point to PCI's taking the lead;

2) a document demonstrating that RCI was taking the lead; or

3) evidence that the Bylaws of PCI bestowed signatory authority on Mr. Roers.

The court has set forth substantial authority to the effect that partners to a *bona fide* joint venture may allocate between themselves their responsibilities. The contracting officer recognized this operating principle, and defendant agreed that a contracting officer is charged with this basic familiarity with joint ventures. Moreover, Mr. Roers did not derive his authority to commit the joint venture from PCI's Bylaws. Had plaintiff shown that RCI was taking the lead, presumably the contracting officer would not have

taken the position that the bid and related documents required two signatures, but that is only speculation. Had PCI's Bylaws authorized Mr. Roers to sign contracts, presumably the contracting officer would have waived her two-signature requirement. But again, this is speculation. The contracting officer's decision finding inadequate authority to bind the parties to the joint venture is irrational or unreasonable.

### 5. Additional showings for injunctive relief

 To show an entitlement to an injunction, plaintiff must make three additional showings: 1) that it will suffer specific irreparable injury if the procurement is not enjoined; 2) that the harm to be suffered by it outweighs the harm to the Government and third parties if the procurement is enjoined; and (3) that granting of the relief serves the public interest. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43, 182 U.S.App.D.C. 220, 221–22 (1977).

Plaintiff has shown that it would be irreparably injured if injunctive relief were not granted in the form of lost profits on any contract awarded to another bidder. Granting injunctive relief to plaintiff would prejudice the other offerors as they would lose potential profits; however, the other offerors were not entitled to the award because plaintiff submitted the lowest responsive bid. The court's action only corrects the contracting officer's irrational or unreasonable decision. Finally, the public interest in making procurement dollars available to qualified contractors; in obtaining services at the lowest cost consistent with procurement needs; and in protecting the integrity of the procurement system from irrational or unreasonable requirements is served by granting the injunction. *See Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 288 (1983) (citing *Gull Airborne Instr., Inc. v. Weinberger,* 694 F.2d 838, 846 & n. 9, 224 U.S.App.D.C. 272, 278 & n. 9 (1982); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302, 147 U.S.App.D.C. 221, 233 (1971); *Keco Indus.,* 203 Ct.Cl. at 575, 492 F.2d at 1204; *General Elec. Co. v. Seamans,* 340 F.Supp. 636, 640 (D.D.C.1972)).

### CONCLUSION

Based on the foregoing, plaintiff's cross-motion for summary judgment is granted, and defendant's motion for summary judgment is denied. The Clerk of the Court shall enter judgment for plaintiff. Accordingly,

**IT IS ORDERED,** effective November 15, 1996, as follows:

1. Defendant by and through the General Services Administration, its officers, agents, and employees, is permanently enjoined from treating PCI/RCI's bid on IFB GS–89P–96–JCC–0005 as nonresponsive.

2. Defendant by and through the General Services Administration, its officers, agents, and employees, is permanently enjoined from awarding the contract on IFB GS–89P–96–JCC–0005 to any entity other than PCI/RCI.

3. Counsel for defendant shall communicate by no later than 3:00 p.m. on November 15, 1996, the contents of this order to the contracting officials of the General Services Administration and shall deliver to them as soon as practicable a copy of this opinion.