ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| BCC-UIProjects-ZAAZTC Team JV | ) ASBCA No. 62846 |
| | ) |
| Under Contract No. W5J9JE-1 l-C-0139 | ) |

APPEARANCE FOR THE APPELLANT:    Patrick B. Kernan, Esq.
   Kernan & Associates, PLLC
   Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
  Rebecca L. Bockmann, Esq.
  Michael E. Taccino, Esq.
   U.S. Army Engineer District, Middle East
   Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE PROUTY

The motion to dismiss we decide here centers upon a dispute between two companies in Afghanistan which had established a joint venture, known as BCC-UIProjects-ZAAZTC Team JV (B-U-Z),[1] to perform a contract with the United States. After performance of the above-captioned contract (the contract) by B-U-Z, one of the companies that made up the venture, Zamarai Ali Ahmad Zada General Trading and Construction Company (ZAAZTC)[2], submitted a request for equitable adjustment (REA) to the contracting officer (CO), seeking about $4 million for costs associated with a differing site condition and the delayed approval of design submittals. The REA was denied as lacking substantiation. Nevertheless, shortly thereafter, the president of ZAAZTC's erstwhile partner, Behnam Construction Company (BCC), reached out to the CO to inform him that ZAAZTC did not have the right to submit claims on behalf of the joint venture and that the CO should only consider claims submitted by him. The BCC president's position, in fact, had the virtue of being supported by the text of the joint venture agreement and the fact that

---

[1] We refer to the party that brought this appeal as "appellant," rather than "B-U-Z" as we normally would because the government argues that the party advancing this appeal is not, in fact, the joint venture.

[2] In a bit of advocacy which obscures the identity of the parties to its advantage, appellant refers to the joint venture as "ZAAZTC" in its briefing (see app. opp'n at 1), despite the fact that ZAAZTC is actually just one member of the joint venture – and the minority member, at that. As will be seen, this is telling.

the contract was executed on behalf of the joint venture by him. ZAAZTC responded to this bombshell by completely ignoring it and submitting a new REA some months later which aimed to address substantive problems with the first REA that the CO had denied. After this REA was, in turn, denied (for having been presented after final payment and because the CO determined that ZAAZTC did not speak for the joint venture), ZAAZTC presented the CO with a "settlement agreement" in which ZAAZTC and BCC had agreed to split any proceeds of the "claim."

In the end, notwithstanding the "settlement," because the claim was not submitted by a person with authority to do so on behalf of the joint venture, we find that we do not possess jurisdiction. Moreover, even if it had been properly submitted, we would have found that it was appealed too late since the claim was denied more than 90 days before the appeal to the Board.

FINDINGS OF FACT

I. Preliminaries

A. Joint Ventures are Formed

On April 11, 2010, two Afghan companies, BCC and United Infrastructure Projects (UIP), entered into a "teaming agreement." According to the terms of the agreement, UIP was to provide design work for the projects the two worked on together, while BCC would perform the actual construction for such projects. (Shafique decl. Ex. 1)[3]

A little more than a year later, on May 20, 2011, BCC entered into a joint venture agreement (the JV agreement) with ZAAZTC (R4, tab 27 at 1; *see also* Shafique decl. ¶ 2). The purpose of the joint venture was to perform the contract that is the subject of this dispute (Shafique decl. ¶ 2); hence, despite being signed on May 20, 2011, the JV agreement would not become effective until the contract was awarded (R4, tab 27 at 1-2). The JV agreement provided that UIP would perform design work for the contract and that BCC would perform 60% of the construction work, while

---

[3] "Shafique decl." refers to the declaration of Muhammad Shafique, Managing Director of ZAAZTC, which is attached to Appellant's opposition to the government's motion to dismiss. Appellant also filed exhibits to that declaration. We refer to them as "Shafique decl. Ex.__." Although appellant asserts that this arrangement was executed in 201<u>1</u>, (app. opp'n at 2) the agreement plainly states "Sunday, April 11, 201<u>0</u>" (Shafique Decl., Ex. 1) (emphasis added). Moreover, April 11 fell on a Sunday in 2010, but was a Monday in 2011, as the government points out in its reply brief (gov't reply br. at 2, n.2).

ZAAZTC would perform 40% of it (*id*. at 2). Accordingly, the proceeds of the contract would be similarly split between the parties, 60/40, with BCC paying the 40% to ZAAZTC (*id.* at 3), which implied that BCC would obtain the proceeds from the government and then pay ZAAZTC its share. Importantly for the dispute before us, paragraph 3.3 of the JV agreement set forth the individual who would represent the parties to the government. That paragraph provided:

> Both parties agreed to introduce and authorize **Mr. Ahmad Tariq Barakzai** to sign the contract on behalf of the joint venture and is authorized to sign solicitations, applicable amendments, and bind the entire joint venture to its obligation under any contract which may result from the solicitation.

(R4, tab 27 at 4) (emphasis in the original) The same Mr. Barakzai executed the JV agreement on the next page as President of BCC. Dr. Wahid Zahed[4] executed the agreement as Vice President of ZAAZTC. (*Id*. at 5)

The JV agreement never set forth a name for the entity it created, but the "footer" of all five pages of the agreement was captioned "BCC-ZAAZTC - Joint Venture Agreement" (R4, tab 27).

## B. The Contract is Awarded

The contract was awarded by the United States Army Corps of Engineers (the Corps) to "BCC-UIProjects-ZAAZTC Team." On July 18, 2011, it was executed by the government CO; on July 20, 2011, Mr. Barakzai (previously noted as the individual specified by the JV agreement) executed the contract as "Team President." (R4, tab 4 at 2) The contract was in the amount of $11,625,113 and was for the design and construction of an Afghanistan National Police battalion patrol facility in Baghlan, Afghanistan (*id*. at 6). The record does not contain any explanation as to why the CO identified the contractor in the contract as the "BCC-UIProjects-ZAAZTC Team," instead of the BCC-ZAAZTC JV as referenced in the agreement discussed above,

---

[4] In several documents in this appeal, we have seen variations of Dr. Zahed's name: sometimes it is Dr. Wahid Zahedi, as it is in the JV agreement (R4, tab 27 at 5); sometimes, Dr. Wahidullah Zahed, such as when he certified the first REA in this matter (Shafique decl. Ex. 4 at 5), and there is also Dr. Wahidullah Zhed (gov't supp. br. Ex. 3 at 11). The signature blocks, executed in ink, all include the somewhat legible letters "Wahid" enclosed in a partial oval. Sometimes, he is referred to as Dr. Wahidullah. Despite the slight differences in the typed name, these are all obviously signed by the same person and we will refer to the author as Dr. Zahed throughout, for clarity.

although we suspect that may have been how the entity identified itself when it bid on the contract. In any event, the weight of the evidence indicates that the contractor we refer to as B-U-Z was one and the same as the BCC-ZAAZTC Joint Venture referenced above, not some other entity that included all three companies as signatories to a different agreement.

The contract included many of the usual standard clauses for a contract of its type. Of particular relevance to this dispute, the contract included, by reference, the July 2002 Disputes Clause found in section 52.233-1 of the Federal Acquisition Regulation (FAR) (R4, tab 4 at 11). Relatedly, it included by reference, the provision in the Department of Defense Supplement to the FAR (the DFARS) governing REAs, DFARS, 252.243-7002 (MAR 1998) (*id*. at 12). It also included FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 2004) (*id*. at 11).

C. Trouble in Performance

After performance began, appellant alleges that it encountered site conditions that differed from what the government had represented. These conditions, according to appellant, significantly delayed completion of the contract and significantly increased B-U-Z's costs. (*See, e.g.*, R4, tab 2) In any event, the contract was substantially complete by September 7, 2014 (R4, tab 25).

II. Disputes of More Than one Variety

A. The First REA is Submitted in July 2014

On July 17, 2014, Mr. Stephen Southerland[5] of Compliance Contracting, LLC, sent to the CO a document styled as an REA on the contract (Shafique decl. Ex. 4).[6] Mr. Southerland asserted in his cover letter that he represented "BCC ZAAZTC JV-UIP Team[7] on contract administration matters for subject contract" (*id*. at 1). The REA, itself, though requesting 276 delay days and a "net total" of $4,049,494 in "claimed" damages, was not particularly detailed and appears to be asserting entitlement (it had a section titled, "Entitlement") based upon both delayed approval of

---

[5] Mr. Southerland was a claims consultant who, according to his LinkedIn profile, provided by the government, had 40 years of experience in government contracting, including 15 as a government CO (*see* gov't supp. br. Ex. 1).

[6] Interestingly, this document is not part of the Rule 4 file, though it is referenced in government correspondence (*see* R4, tab 24) and we have no reason to question the authenticity of the version provided with the Shafique Declaration.

[7] The contract was not actually with "BCC ZAAZTC JV-UIP Team," as Mr. Southerland wrote but, as noted above, was with "BCC-UIProjects-ZAAZTC Team."

design transmittals and a differing site condition (*id*. at 2-5; *see also* Shafique decl. ¶¶ 6-7) (describing bases of REA).  One significant problem with this REA is that its "net total" of damages is mathematically inconsistent with the numbers that Mr. Southerland purportedly used to arrive at this figure on behalf of his client.  It plainly states that the $4,049,494 is derived by adding $1,532,076 in "quantum meruit" damages to $264,960 in "mitigated liquidated damages" to $2,335,790 in extra excavation costs[8] due to a differing site condition minus $233,332 for grading already included in the contract (*see* Shafique decl. Ex. 4 at 1).  If we do the math of $1,532,076 + 264,960 + $2,335,790 - $233,332, we arrive at $3,899,494, which is $150,000 less than the "net total" requested in the REA.  The component numbers are all repeated within Section III, "Pricing" of the REA and so, too, is the "net total" of $4,049,494 (*id*. at 4-5).  As a matter of fact-finding, it is not clear whether the REA was requesting $4,049,494 or was really intended to request $3,899,494 (or even $3,899,484 if the math error on the excavation amount were corrected).

This REA never explicitly requested a decision by the CO (*see* Shafique decl. Ex. 4).  It was executed by Dr. Zahed (he who executed the JV agreement on behalf of ZAAZTC, as noted above), who signed at the end, under the section labelled "Part IV. 10 USC 2014(a)[9] Certification," which included language attesting to the good faith nature of the REA and that the data was accurate to the best of his knowledge and belief.  Under his signature, Dr. Zahed had a signature block which identified him as "Vice President BCC- ZAAZTC" and included a ZAAZTC email address.  (*Id*. at 5) Mr. Barakzai's name and signature are nowhere to be found on this document.

The CO responded to the REA by sending a letter by email on July 27, 2014, addressed to Dr. Zahed, but to a BCC email address, asking for supporting documentation and a baseline schedule.  He explained that, without such information, he could not assess the merits of the claim, and that if he did not receive it within 10 days, he would assume no such evidence existed and would make his decision without it.  (R4, tab 24)

It is not clear whether further information was provided to the CO (there is none in the Rule 4 file) and on September 15, 2014, in a letter sent to Dr. Zahed on the same BCC email address as the July 2014 letter, the CO denied the REA.  He did so for lack of substantiation of the costs and for the contractor's alleged failure to notify the CO

---

[8] This number, too, is off, but just by a little bit.  It is derived by multiplying the number of extra cubic meters excavated by $10.  The number of extra cubic meters (according to the REA) is 233,57_8_, but the cost in the REA was $2,335,7_90_.  (*See* Shafique decl. Ex. 4 at 4)

[9] This section of the United States Code requires a certification for REAs that is less comprehensive than the certification the CDA requires for claims over $100,000.  *Compare* 10 U.S.C. § 2014(a) to 41 U.S.C. § 7103(b).

5

of the differing site condition. This letter closed by referring Dr. Zahed to the contract's Disputes Clause if he was dissatisfied with the results. (R4, tab 28) Although there is no direct evidence that Dr. Zahed received this email, the preponderance of circumstantial evidence supports a finding that he did: in a second declaration from Mr. Shafique that was submitted in response to our request for supplemental briefing, he stated that ZAAZTC (ZAAZTC being defined in this declaration as the stand-alone company, not the joint venture) had received a number of communications from the CO, including one dated "July 15, 2014," which did not include the right to appeal the CO's decision (app. supp. br. Ex. 1 at 1). There is no indication elsewhere in the record of any July 15, 2014 communication from the CO to B-U-Z or ZAAZTC, which causes us to believe this was a typo and that Mr. Shafique most likely meant the September 15, 2014 communication, especially since the REA was submitted two days *after* July 15, 2014. Moreover, as discussed below, there is evidence that a later REA submitted by Mr. Southerland responded to the criticisms in the September 15, 2014 CO's letter.

### B. Mr. Barakzai Disavows Claims Submitted by Anybody but Him

On March 23, 2015, Mr. Barakzai sent an extraordinary letter to the CO demanding that any claim on the contract submitted by anybody but him should "be immediately dismissed by USACE" (R4, tab 26). This letter began by stating that, "Ahmad Tariq Barakzai, President of the BCC -ZAAZTC JV and President of BCC-ZAAZTC JV - UIP Team is the only legally authorized person to sign and submit any claims regarding the CN#W5J9JE-11-C-0139 - Collapsible Soil" (*id.*). It moved on to demand dismissal of unauthorized claims, as noted above, and ended by "inform[ing]" the CO that anybody else who had submitted a claim on the contract on behalf of B-U-Z did not have the authority to do so. The last line of the letter provided two email addresses that Mr. Barakzai instructed the CO were "[t]he only legitimate" ones for correspondence. (*Id.*) There is no evidence before us of any response by the government to this letter as there were no pending claims at this time.

### C. Another REA is Submitted (not by Mr. Barakzai) in July 2015

Notwithstanding Mr. Barakzai's March 23, 2015 letter, Mr. Southerland, again with Dr. Zahed's cooperation, submitted an REA to the CO regarding the alleged differing site condition, but made no mention of delays in responding to submittals and reduced the demand to $3,453,725[10] (R4, tab 2 at 1). This second REA was dated May 27, 2015, though actually submitted on July 8, 2015 because Mr. Southerland apparently had difficulty reaching the CO (*see* R4, tab 29 at 3), and had a similar cover letter from Mr. Southerland to the 2014 REA, averring that he represented the "BCC

---

[10] It did not include any of the glaring mathematical inconsistencies of the 2014 REA.

6

ZAAZC[11] JV – UIP Team" for contract administration matters (R4, tab 2 at 1). It made no mention, whatsoever, of the July 2014 REA or the CO's rejection of it, though it directly addressed the prime bases for that rejection by providing a spread sheet with its costs and explaining that it did not need to point out the differing site condition to the CO since the government was on constructive notice of the conditions (*id*. at 1, 4). It is rather obvious to us that Mr. Southerland drafted the REA with the CO's prior rejection of the first REA in mind. The text of the REA closed with a certification made by Dr. Zahed, again identified in his signature block as "Vice President BCC-ZAAZTC" (*id*. at 4). On July 12, 2015, Mr. Southerland sent a follow-up email to Mr. Sanchez (the CO) in which he noted that he could obtain a letter from Dr. Zahed authorizing him to speak on behalf of the contractor if Mr. Sanchez wished (R4, tab 29 at 2).

### D. The Corps has Some Questions and Denies the REA

On August 5, 2015, Mr. Dennis Denker of the Corps, sent an email to the two email addresses cited at the end of Mr. Barakzai's March 23, 2015 letter. The email noted that letter and asked whether its disavowal of claims not coming from Mr. Barakzai still applied to the May 27, 2015 REA that the Corps had received from Mr. Southerland in July which was certified by Dr. Zahed. It provided that, if things had changed and Mr. Southerland or Dr. Zahed were now permitted to submit claims on behalf of the joint venture, the Corps would need a signed letter from Mr. Barakzai to that effect. (*See* gov't supp. br., Ex. 3 at 5-6)

After Mr. Denker sent a follow-up email on August 25, 2015, requesting some confirmation that he had sent the email to the proper party (*id*. at 5), Mr. Barakzai responded in an email dated September 13, 2015 (*see id*.). This email bluntly stated:

> Benham CC has not submitted the REA for Collapsible
> Soil of Baghlan project and, therefore, can't confirm it and
> can't provide certification.
>
> The REA has been submitted to USACE by unauthorized
> parties without Mr. Ahmad Tariq Barakzai's consent.

(*Id*.)

On December 1, 2015, Mr. Shafique, from ZAAZTC, sent an email to Mr. Sanchez of the Corps (to whom Mr. Southerland had first sent the 2015 REA). He inquired about the status of "our claim." He further noted that "was too long that we

---

[11] Although the T was left off of ZAAZTC we presume this to have been a mere typographical error, rather than indicating a different entity.

haven't received any further updated from Govt."  Mr. Sanchez responded with an email on December 16, 2015, informing Mr. Shafique of the email from Mr. Barakzai stating that the REA was unauthorized.  Mr. Sanchez stated that, as a result of that email, the Corps considered the contract closed.  Mr. Sanchez added that final payment had been made on the contract in September 2014, and under the FAR, no REAs are to be considered for differing site conditions after final payment.  He ended his email stating:  "I consider this matter closed.  No further action will be considered on this request."  (*See* gov't supp. br., Ex. 3 at 1)

E.  ZAAZTC and BCC Resolve Their "Internal Dispute"

Apparently, Mr. Sanchez's December 16 email had an effect on the joint venture partners.  In a document dated February 7, 2016 (R4, tab 30 at 1), but with apparently notarized signatures dated February 8, 2016 (*id*. at 2), Mr. Barakzai and Dr. Zahed made a self-titled "Settlement Agreement" (*id*. at 1).  The agreement provided that BCC and ZAAZTC would be the "beneficiaries of any monies received from [the Corps] under a claim for [the contract]."  The agreement further provided that ZAAZTC "covenants and agrees that it has submitted a claim for [the contract] and shall pay 50% of any proceeds paid by [the Corps] for such settlement proposal to [BCC]."  It concluded by stating, "The Joint Venture of the parties is hereby dissolved."  (*See id*.)

Notably, the settlement agreement did not purport to retroactively authorize Dr. Zahed to submit the REAs[12] himself (or through Mr. Southerland) (R4, tab 30).  In response to our supplemental briefing order, appellant concedes that there is no such authorization to be found in the settlement agreement or elsewhere in the record (app. supp. br. at 13-14).

On Feb 10, 2016, Mr. Barakzai[13] sent an email to Mr. Sanchez, attaching a copy of the executed settlement agreement, which he characterized as "the resolution of the earlier internal dispute," implicitly requesting the REA be addressed (gov't supp. br., Ex. 4 at 4).  Dr. Zahed sent Mr. Sanchez a follow-up email on March 10, 2016 requesting an update on the status of the REA in light of the resolution of the dispute between the parties (*id*. at 2-3).  Mr. Sanchez responded the next day that he considered the matter closed "per my 17 Dec 15 email to Mr. Shafique" (*id*. at 2).  On March 13, 2016, Mr. Southerland re-entered the picture, with an email to Mr. Sanchez stating that, "[a]s you know, my company represents ZAAZTC" and inquiring about how final payment could have been effected on the contract without a release (*id*. at 1-

---

[12] It refers to a single claim, which we presume to be the one submitted by Mr. Southerland in July 2015.

[13] The email is signed by "Ahmad Tariq" (gov't supp. br., Ex. 4 at 4), which we understand to be Mr. Barakzai's first two names.

8

2).  In response, on March 12,[14] Mr. Sanchez informed Mr. Southerland that the claim was not considered live at the time of the final payment because BCC had informed the government that it was unauthorized (*id.* at 1).  There appears to have been no further communications until more than two months later, on May 30, 2016, when Mr. Southerland emailed to Mr. Sanchez that "we wish to proceed with the REA and/or possibly convert it to a claim" (*id.* at 1).  Mr. Larosa, from the Corps responded to this email:  "Convert to a claim – REA has been responded to" (*id.* at 1).

The government has not issued any additional CO's final decisions beyond Mr. Sanchez's December 17, 2015 determination, and, on March 11, 2021, appellant filed with the Board an appeal of what it considered to be a deemed denial of its "May 27, 2015" claim.  Appellant's complaint states that the Board's jurisdiction is based on the government's failure to respond to the May 27, 2015 claim which, appellant concedes, was sent to the CO on July 8, 2015 (*see* compl. ¶ 3).  The complaint makes no reference to the dispute about authority to pursue claims on behalf of B-U-Z, nor does it mention the May 2016 correspondence (*see id.*).

F.  A Final Wrinkle

We requested supplemental briefing upon a number of subjects, including whether the CO made final decisions on the two REAs and whether any failure to include notification of appeal rights in these notifications would have been to the prejudice of appellant in submitting a timely appeal (*see* Order dtd. September 23, 2021).  In response to the prejudice inquiry, appellant provided a second declaration from Mr. Shafique.  Mr. Shafique declared that ZAAZTC (here, meaning the company, ZAAZTC, and not the joint venture of which ZAAZTC was a partner) had received the CO's communications dated July 15, 2014, December 17, 2015, and March 12, 2016.  He noted that none of these communications included notice of a right to appeal a CO's final decision and that "[a]bsent this notice ZAAZTC had no knowledge of a contractor's right to appeal from a contractor's final decision under the Contract Disputes Act."  (App. supp. br. Ex. 1 at 1)  He further averred that if the letters had included such notice or even a partial notice, the company would have contacted counsel to discuss their rights (*id.* at 1-2).  Finally, he noted that "prior to this contract we had performed numerous contracts with the United States Government; however, we never had a dispute with the United States government over the performance of a contract" (*id.* at 2).

---

[14] It seems odd that Mr. Southerland's email is dated March 13, 2016, while Mr. Sanchez's response is dated a day earlier, the 12th, but we presume this to be an artifact of the two email servers being in different time zones.

9

As pointed out by the government (*see* gov't supp. br. at 22), this last statement is demonstrably incorrect:  ZAAZTC, in fact, has had at least one other dispute with the United States government in contract performance and is familiar with the procedures for appealing decisions to the Board, having done so in 2014, though that case was dismissed for failure to prosecute.  *See ZAAZTC Co.*, ASBCA No. 59194, 14- 1 BCA ¶ 35,767.[15]

DECISION

The government motion to dismiss this appeal has multiple bases, but they are largely variations upon the theme that the wrong party submitted and certified the claim and continues to wrongly represent itself as B-U-Z here.  We address the matter more directly and simply:  Because there is no appeal of a properly submitted and denied (or deemed denied) claim before us, we grant the government's motion to dismiss the appeal.  We find it relatively easy to find that the two REAs, submitted approximately a year apart, were not claims because they were not submitted by B- U- Z, but by somebody who the proper representative of B-U-Z explicitly stated did not possess authority to submit them.  They were denied before that was attempted to be remedied, and appellant maintains that the claim being appealed before us is the one that was submitted in July 2015 – one of the claims that was so closed.

Additionally, we find that, even if the July 2015 claim were submitted by a contractor and even if appellant could maintain this action despite B-U-Z's having been dissolved by the February 2016 "settlement", Mr. Sanchez's December 2015 email to Mr. Shafique constituted a contracting officer's final decision which was not appealed to the Board within the 90-day statutory period.  We also address two additional issues raised by the government:  first, finding that, since the (faulty) claim upon which appellant asserts jurisdiction did not include allegations regarding the government's failure to timely decide upon contract submittals, that cause of action would not be viable, even if we otherwise possessed jurisdiction to consider it; second, declining to decide whether counsel is authorized to represent B-U-Z.

I.    The Burden of Proof is on Appellant to Establish our Jurisdiction

It is well established that, once jurisdiction has been challenged, the burden lies with the appellant to establish it, through a preponderance of the evidence.  *See, e.g., Tetra Tech EC, Inc.*, ASBCA Nos. 62449, 62450, 21-1 BCA ¶ 37,900 at 184,054

---

[15] In that case, ZAAZTC was represented by Mr. S. Ahmad Shah (*see ZAAZTC*, 14- 1 BCA ¶ 35,767) who remains listed as a member of the ZAAZTC "group" on the company's website (*see* gov't supp. br., Ex. 2).  We find it highly unlikely that Mr. Shafique, managing director of ZAAZTC, would have been unaware of this previous appeal.

(citations omitted); *see also Gen. Mills, Inc. v. United States*, 957 F.3d 1275, 1284 (Fed. Cir. 2020); *Reynolds v. Army Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). We accept as true all undisputed facts in the complaint and draw all reasonable inferences in favor of the non-moving party. *Estes Exp. Lines. v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). We may also "inquire into jurisdictional facts" where there is a dispute. *Gen. Mills*, 957 F.3d at 1284 (citing *Rocovich v. United States*, 933 F.2d 991,933 (Fed. Cir. 1991)). Thus, where necessary, we may engage in fact-finding based on our review of the record. *See CCIE & Co.*, ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816 (citing *Raytheon Missile Sys.*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,016).

## II. Appellant's Appeal Must be Dismissed Because There is no Claim Submitted by the Joint Venture

Under the Contract Disputes Act (CDA), our jurisdiction is premised upon the appeal of a CO's final decision upon a valid claim submitted by a contractor. *See* 41 U.S.C. §§ 7103, 7104. We will discuss other components of a claim in more detail in Section III below, but our focus here is upon the CDA's requirement that the claim be submitted by a "contractor." 41 U.S.C. § 7103.[16] There is no such claim here.

### A. The Contractor Here is the B-U-Z Joint Venture

Though it may seem to be a matter of semantics, it is an important truism that the party the government has contracted with here is the B-U-Z joint venture. It is not the component companies of ZAAZTC or BCC. *See, e.g., PHA-JMR JV*, ASBCA No. 59032, 14-1 BCA ¶ 35,685 at 174,675-76 (quoting *WorleyParsons International, Inc.*, ASBCA No. 57930, 14-1 BCA ¶ 35,482 173,959-60). UIP also plays a part, although the joint venture agreement forming B-U-Z was between only BCC and ZAAZTC.[17]

---

[16] This is a different argument than one regarding the certification of the claim. Though many of the cases discussed herein revolve around the question of claim certification required by 41 U.S.C. § 7103(a)(1), (b), here, we are looking to whether the claim, itself, was submitted on behalf of the joint venture. By statute, a claim certified by the wrong person can be remedied in the midst of litigation, *see, e.g., Metro Machine d/b/a General Dynamics NASSCO-Norfolk*, ASBCA No. 62221, 20-1 BCA ¶ 37,631 at 182,695; there is no basis to find that a claim not submitted by the contractor can.

[17] The government has made arguments that the ever-shifting name of the joint venture in the contract, the correspondence, and the claim(s)/REA(s) is a basis for finding lack of authority to submit the claim (*e.g.*, gov't mot. at 11-13). We are sympathetic to this argument and believe that the sloppiness in naming the JV is a symptom that stems from the illness that pervades this matter – ZAAZTC

11

B. No Claim was Submitted by B-U-Z

It is a basic proposition, but important to note that, since B-U-Z is not a "natural person," the CDA requires that the person who submits the claim to the government be a person with authority to bind the contractor as to the claim. *See Kiewit/Tulsa-Houston v. United States*, 981 F.2d 531, 533 (Fed. Cir. 1993) (citations omitted). Although individual partners in a joint venture may generally take action for the joint venture, *see, e.g., Lentz v. United States*, 346 F.2d 570 (Ct. Cl. 1965); *Saldemi Joint Venture v. Dalton*, 5 F.3d 510, 513 (Fed. Cir. 1993), the terms of the joint venture agreement are controlling when they are more limited. *See Kiewit/Tulsa-Houston*, 981 F.2d at 534 (generally applying terms of the agreement to determine authority issues); *Saldemi*, 5 F.3d at 513 (recognizing the rule from *Kiewit/Tusla-Houston*); *see also PHA-JMR JV*, 14-1 BCA ¶ 36,685 at 174,676.

1. Mr. Southerland did not Possess Authority to Submit Either the 2014 or the 2015 REAs[18] to the Government

The first question presented to us is whether Mr. Southerland, who apparently derived all of his authority from Dr. Zahed, possessed the authority to submit the two REAs on behalf of B-U-Z. Given the fact that Dr. Zahed provided certifications (of a sort) to the REAs submitted by Mr. Southerland and the government has presented no challenge to Mr. Southerland's actions on this ground, we find it appropriate to consider Mr. Southerland to have been acting under a grant of whatever authority Dr. Zahed possessed. Dr. Zahed, however, did not possess authority to present claims on behalf of the joint venture.

We arrive at this conclusion by a careful review of the joint venture agreement, reading it like any other contract, interpreting it "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (Breyer, J., concurring) (citations omitted), and "constru[ing it] to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002). The agreement specified that the parties would "authorize" Mr. Barakzai to sign the contract on behalf of the joint venture, to sign applicable amendments, and to "bind the entire joint venture to its obligation under any contract which may result from the solicitation."

---

personnel acting on behalf of their own company and not on behalf of the joint venture. Nevertheless, minor errors in the naming of the contractor, when it is evident what is being referred to, are not a basis for us to dismiss this appeal. *Cf. Bell Helicopter Textron, Inc. and the Boeing Co.*, ASBCA No. 59561, 15- 1 BCA ¶ 36,111 at 176,293.

[18] As will be discussed later in this opinion, appellant would later refer to these REAs as claims.

Though it does not specify the submission of claims, we find this grant of authority to be broad enough to encompass this duty. *See Stradadile/Aegis Joint Venture*, ASBCA No. 39318, 95-1 BCA ¶ 27,397 at 136,587-88 (broad delegation of authority would encompass the authority to submit claims even if not specifically mentioned). And although it does not expressly preclude other representatives of the individual joint venturers from acting on behalf of the joint venture in dealing with the government, it implicitly does so since the clear intent of the agreement's language was to vest authority in dealing with the government in one representative of the joint venture and that representative was Mr. Barakzai – the representative of the majority partner. Moreover, the JV agreement explicitly vested in him the authority to bind the joint venture to the contract. Hence, we are convinced that the agreement precluded ZAAZTC from submitting claims to the government without Mr. Barakzai's consent. *Cf. Bellinc Co, Inc. v. Babbitt*, 107 F.3d 30 (Fed. Cir 1996) (table) ("full and complete authority" to act for joint venture precluded other member of joint venture from possessing such authority). Any other reading of the JV agreement would be disfavored since, if both parties to the agreement retained the inherent authority to perform the duties explicitly granted to Mr. Barakzai in the agreement, there would be no need for the agreement to spell out that he could and would perform them without mentioning the ZAAZTC partner. Moreover, the structure of the JV agreement, with the assumption that contract proceeds would be made to the majority partner (BCC), which was represented by Mr. Barakzai, and then disbursed to ZAAZTC is consistent with BCC being the joint venture's representative to the government. Finally, though UIP was not a signatory to the JV agreement, it plainly had interests in it that stemmed from its prior agreement with BCC and those interests would be protected only if the party with whom it had a separate agreement (BCC) had final say on dealings with the government.

Appellant argues that the facts here are similar to those in our decision in the appeal of *Rosinka Joint Venture*, ASBCA No. 48143, 97-1 BCA ¶ 28,653, in which we (according to appellant) permitted a claim to be advanced by just one of the joint venturers after a dispute between the two was subsequently resolved (app. supp. br. at 15). Appellant misreads *Rosinka*. First, it is important to explain that the portion of that opinion cited by appellant was not joined by two of the judges on the three-judge panel that considered it since they believed it unnecessary to consider the issue. *See Rosinka*, 97-1 BCA ¶ 28,653 at 143,140. Hence, it is not binding precedent upon us. Moreover, even the nonbinding part of the opinion that appellant is relying upon does not say what appellant thinks it says; instead, it says that a managing partner, to whom authority to conduct substantially "all affairs" of the joint venture was granted, could be considered to have authority to submit a claim. *See id.* at 143,137-38. That is in no way similar to the facts presented here. The managing partner here was more analogous to Mr. Barakzai than to Dr. Zahed.

Even if we misinterpret the agreement and, in fact, both ZAAZTC and BCC had the right to advance a claim (or REA) on behalf of the joint venture, Mr. Barakzai's communications to the government, effectively withdrawing both REAs, would be binding since the agreement at the very least gives him final say in representations to the government (the agreement permitted him to bind the joint venture), and his affirmative action in directing that the REAs be withdrawn means that they cannot be considered to be authorized claims.

2. The "Settlement" did not Retroactively Provide Mr. Southerland Authority to Submit the Claims

When we directed the parties to provide additional briefing upon the motion, one of the questions that we asked was whether the February 2016 "settlement" between ZAAZTC and BCC purported to retroactively authorize Mr. Southerland's activities as being on the joint venture's behalf and, if so, where it did so (*see* Order dtd. September 23, 2021). Appellant's response was that there was no such retroactive authorization because Dr. Zahed always possessed the authority to submit a claim on behalf of the joint venture (*see* app. supp. br. at 14-15).

We agree that there was no retroactive authorization here, for there is no place in the record which can be found to do as much.[19] Indeed, the "settlement agreement" is a recognition that ZAAZTC had submitted a claim on the contract (though it does not specify that the claim was submitted on behalf of B-U-Z) and an agreement to split any proceeds from that claim. Put slightly differently, it did not purport to authorize that claim; rather, it accepted it as a *fait accompli*, and divided the possible results. Of note, although the original JV agreement included a 60/40 split of the proceeds, with 60% going to BCC and 40% to ZAAZTC; the settlement agreement sent only 50% of the proceeds to BCC with the other 50% going to ZAAZTC. This is further evidence that ZAAZTC was not acting on behalf of B-U-Z when Dr. Zahed had Mr. Southerland submit the REAs, because, if it had been, the rules of the original JV agreement would appear to spell out how the proceeds of the REAs would have been distributed, with the money first going to BCC which would distribute to ZAAZTC its smaller share.

---

[19] We are not so certain that a retroactive authorization would be effective in any event: the REAs considered and denied by the CO were never properly before him at the time that he acted on them. Not to belabor the point, but this is not like certification of a claim that, by statute, is permitted after the fact when defective. *See* 41 U.S.C. § 7103(b)(3).

3. Appellant Does not Assert That it Submitted a Later Claim

For its own reasons, appellant has never asserted that Mr. Southerland's communications with the government *after* Mr. Sanchez's email in December 2015 rejecting the REA constituted a claim or the perfection of a claim. It could certainly have argued that Mr. Southerland's May 2016 statement that "we" wished to proceed with the REA or pursue a claim constituted a reach back to the May 2015 claim and, perhaps, a resubmission of it – this time with whatever authority the settlement agreement may have provided. But appellant does not make this argument. Further, we will not make it for it, especially since there are a number of complications that are not addressed by the briefing that could preclude the success of such an argument, such as the (possibly related) facts that the settlement agreement dissolved B-U-Z and Mr. Southerland did not purport to be acting on behalf of B-U-Z in 2016, but for ZAAZTC. Moreover, appellant does not present any argument about whether a new claim could be advanced on behalf of B-U-Z after the entity ceased to exist and, without knowledge of Afghan law, we cannot determine whether this is a case, like *Rosinka*, where dissolution of the entity precludes further actions on its part, such as bringing a claim or suit or whether, under the appropriate law, the dissolved joint venture still maintains the ability to conclude its business. But the burden of proof would be on appellant in any event and it has not advanced evidence supporting a finding that Mr. Southerland's 2016 communications with the government advanced a claim on behalf of B-U-Z or that they could have.

Thus, because the July 2015 claim that is appellant's avowed basis for this appeal was not submitted by the contractor, it is not a valid claim and we do not possess jurisdiction to consider this appeal.

III. Alternatively, Appellant's Appeal is Untimely

Throughout the briefing of this matter, and in the complaint and in the settlement agreement, appellant has referred to the 2014 and 2015 REAs as "claims." If, however, they were claims, as defined by the CDA,[20] appellant was informed that they were unequivocally denied more than 90 days prior to this appeal, in which case this appeal would be untimely. As will be seen, the first REA was not a claim, but the second one would have been if it were authorized.

---

[20] We, of course, find that they are not because they were not submitted by the contractor.

15

A. The First REA Does not Meet the Definition of a CDA Claim, but the Second one Does

1. What Makes a Claim

We recently had cause to discuss the definition of a claim in *BAE Sys. Ordnance Sys., Inc.*, ASBCA No. 62416, 21-2 BCA ¶ 37,800 at 183,577:

> "Claim" is not defined by the CDA, . . . thus the Federal Circuit instructs that we turn to the FAR for its definition. *See, e.g., H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1564-65 (Fed. Cir. 1995). FAR 2.101 provides that a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or related to the contract."

Among other things, the claim must explain its basis, *see Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) (claim must provide CO "adequate notice of [its] basis and amount"), and request a decision by the CO. *See* 41 U.S.C. § 7103(a). Additionally, the CDA requires that all claims over $100,000 in value (such as the ones here) be certified in accordance with 41 U.S.C. § 7103(b). *Special Operative Grp., LLC,* ASBCA No. 57678, 11-2 BCA ¶ 34,860 at 171,480 (citation omitted). But so long as there is an attempt at certification, even if it is defective (either in the person certifying it or in the language used in the certification), it may be remedied by the contractor prior to the entry of final judgment against the government. 41 U.S.C § 7103(b)(3). Indeed, the Federal Circuit has recently made very clear that the defect in the certification can be quite glaring and yet still be subject to cure. *See DAI Global LLC v. Adm'r of the United States Agency for Int'l Dev.*, 945 F.3d 1196 (Fed. Cir. 2019).

Notably, none of the components of the definition of claim rest upon the opinion of the CO, and his or her subjective opinion is irrelevant to the matter of whether a communication from a contractor to the CO is a claim or not. *See BAE*, 21- 1 BCA ¶ 37,800 at 183,578, n.7. Similarly, a document may be called an REA by the contractor, but nevertheless be considered a claim so long as it fits within the FAR's definition of claim. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995); *Hejran Hejrat Co. Ltd v. United States Army Corps of Engineers*, 930 F.3d 1354, 1357-58 (Fed. Cir. 2019).

16

### 2. The First REA Does not fit the Definition of Claim

The first REA certainly meets some components of a claim: it is a written demand, as a matter of right, for payment of money by the government. Moreover, it included a certification of sorts, albeit a defective one[21] since the certification did not include the full set of assertions required by the CDA. Nevertheless, it does not explicitly request a CO decision nor does it seek a sum certain or adequately explain its bases.

Although the request for a CO's decision is not required to be explicit and may be inferred from the circumstances, *see Hejran Hejrat*, 930 F.3d at 1357-58; *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1543 (Fed. Cir. 1996), we entertain serious doubt that this REA made such a request. Besides the document itself, which makes no such request for decision, there were no other communications from appellant to the government that could be seen as converting the REA to a claim. In any event, we need not determine whether the first REA implicitly requested this decision since it is clear that it did not seek a sum certain. This is because a fair reading of the REA produces two different numbers being requested: the "net total" of $4,049,494 and the number calculated by summing the four numbers that Mr. Southerland stated were the bases of the net total: $3,899,494. To be sure, one might conclude that the "net total" is what is being requested, especially since Mr. Southerland repeats that figure twice in the REA, but since the mathematics of what Mr. Southerland purports to be requesting are so clear, there is a good argument to be made that the $3,899,494 number is what is really being sought. Indeed, in cases in which a net figure is not explicitly requested, but can be easily determined by resort to simple math, such a calculated amount is the sum certain. *See Creative Management Servs., LLC v. United States*, 989 F.3d 955, 963 (Fed. Cir. 2021); *Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005), *aff'd* 183 Fed. App'x 975, 977 (Fed. Cir. 2006). Given the two different numbers, we have an ambiguity, which is plainly not a sum certain. Moreover, were we to decide to take the number defined as the "net total,"[22] we would be faced with the question of where the missing $150,000 came from. Since a claim is required to at least minimally explain its bases and pulling a number out of "thin air" is not a basis, taking this option would only lead to a different reason for finding the first REA not to be a claim, to wit: its failure to explain its basis sufficiently for the CO to act upon it.

---

[21] We have previously held that the use of the particular language included in the REA certifications signed by Dr. Zahed is a remediable defect in certification. *See BAE*, 21-1 BCA ¶ 37,800 at 183,578 (citing *Air Services, Inc.*, ASBCA No. 59843, 15-1 BCA ¶ 36,146 at 176,426-27). Post *DAI Global*, this conclusion has only been strengthened.

[22] This, in fact, is the number that appellant rests upon in its briefing (*see* app. opp'n at 11).

3. The Second REA Does fit the Definition of Claim (Except for who Submitted it)

Unlike the first REA, the second REA includes a sum certain, not subject to confusion. Moreover, it is in writing, demands payment of that sum as of right, and includes the same defective, but subject to remedy, certification that was found in the first REA. The question of whether this REA is a claim, then, turns upon whether it requests a CO's decision.

Like the first REA, there was no explicit request for a decision in the second REA when Mr. Southerland sent it to the CO. The difference between the two is that it followed the first REA by about a year, seeking much the same damages (though not exactly, plus, it did not seek compensation for alleged delays in processing contract submittals) and there was subsequent correspondence from appellant for the second REA. That correspondence came in the guise of the December 1, 2015 email from Mr. Shafique to Mr. Sanchez suggesting that it was "too long" since the submission of the "claim" and asking for its status. Mr. Shafique was polite and respectful in this note, but by referring to his "claim" and stating that it was "too long" and that he was asking for an update on its status, we find that he crossed the threshold to implicitly requesting a decision on the REA. Hence, by the time of the December 1, 2015 email, the second REA was a claim, just as appellant asserts.

The government argues that the second REA was not a claim because it was not the intent of appellant to submit anything but an REA at the time Mr. Southerland submitted it (gov't supp. br. at 28-29). To the extent that the intent of the contractor is relevant,[23] however, what was important was not what appellant intended when it first submitted the REA, but what the REA became over time, and by the December 1, 2015 email, things had changed enough for us to find an implicit request for a final decision.[24]

B. The Second REA Was Denied by the CO on December 17, 2015

The second REA being a claim, it was clearly denied on December 17, 2015 when Mr. Sanchez, after informing Mr. Shafique that he had received Mr. Barakzai's

---

[23] We have previously expressed the opinion that, subject to constraints of the law, a contractor should be able to keep an REA an REA if it so chooses, *see BAE*, 21- 1 BCA ¶ 37,800 at 185,579, but there is no evidence here that the contractor intended to keep the REA from turning to a claim, while the extrinsic evidence (e.g., referring to the REA as a "claim") suggested just the opposite.

[24] The government also appears to argue that the understanding of the CO is relevant to whether an REA is a claim (*see* gov't mot. at 17-19), but, as explained above, that is irrelevant.

September 13, 2015 email stating that the claim was not valid and that he had been advised to consider the contract closed, stated that "I consider this matter closed. No further action will be considered on [t]his request." That was definitive and left no room for question.

Appellant argues that the December 17, 2015 email is not a final decision because it includes "no substantive analysis of ZAAZTC's claim," but cites no law in support of this supposed requirement (*see* app. supp. br. at 9). That is because there is none.

The CDA specifies that, with respect to the contents of a CO's final decision, it:

> . . . shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter. Specific findings of fact are not required. If made, specific findings of fact are not binding in any subsequent proceeding.

41 U.S.C. § 7103(e). It does not require "substantive analysis" of a claim that has been denied for procedural reasons, just an explanation for its reasons. Mr. Sanchez's email was clear in his reasons for the decision: that appellant was not the proper party to advance the claim and that final payment had been made. It was also clear as to its finality. The only remaining question is that of the impact of its failure to advise appellant of its appeal rights.

Although the CDA requires the CO's final decision to include an advisement of appeal rights, *see* 41 U.S.C. § 7103(e), the failure to include this information does not affect the validity of the CO's final decision or stop the clock on the appeal submission from running unless appellant can prove prejudice. *See Decker & Co. v. West*, 76 F.3d 1573, 1579-80 (Fed. Cir. 1996); *see also Mansoor Int'l Development Services*, ASBCA No. 58423, 14-1 BCA ¶ 35,742 at 174,926. When we posed the question to the parties of whether the Sanchez email was a final decision, we also informed them directly of the *Decker* standard, above, and advised appellant of the need to demonstrate prejudice stemming from the lack of the notice of appeal (*see* Order dtd. September 23, 2021 at 2). Appellant's response falls short of the mark.

As noted above, Mr. Shafique's declaration in support of a finding of prejudice concludes that ZAAZTC (the company, not the joint venture) "had no knowledge of a contractor's right to appeal under the [CDA]." It also stated that if there had been a notice of appeal rights – even an incomplete notice, it would have consulted its lawyers. And it closed by stating that the company had performed numerous contracts with the United States before this time but never had a dispute. Unfortunately, as discussed above, we find that significant portions of the Shafique declaration are factually false.

19

In 2014, the year before the CO's decision here, ZAAZTC brought an appeal to the Board and the individual who brought that appeal on behalf of ZAAZTC remains associated with that company. Thus, we conclude that ZAAZTC, in fact, knew both of its right to appeal decisions to the Board and knew how to do so. Its statement that it was prejudiced by lack of appeal information is premised on its not knowing either, which is untrue. We further add that Mr. Southerland was deeply involved with appellant's prosecution of its claims from July 2014 through May 2016 and that Mr. Southerland has had decades of experience in government contracts. We find it highly unlikely that he was unaware of the procedures for appealing CO decisions. Similarly, the September 15, 2014 denial of the first REA, which we have found that appellant received, included reference to the contract's Disputes Clause, which was another route through which appellant would have been provided information about the means to appeal an adverse final decision. *Cf. RMA Eng'g S.A.R.L. v. United States*, 140 Fed.Cl. 191, 216 (2018) (notification of right to appeal under the Disputes Clause adequate). In any event, even without Mr. Southerland's knowledge or the reference to the Disputes Clause in the September 15, 2014 email from the CO, we would conclude that the falsehoods in the Shafique declaration detract so much from its value that there is effectively no evidence presented by appellant in support of its allegation of prejudice. Moreover, ZAAZTC's demonstrated ability to bring an appeal to the Board is affirmative evidence of the opposite. We thus hold that appellant has failed to meet its burden of proving that it was prejudiced by the CO's failure to include appeal rights in his final decision.

### C. No Appeal Was Filed Within 90 Days of the Denial of the Second REA

The Board lacks jurisdiction to consider appeals filed more than 90 days after the contractor has received the CO's final decision. *See* 41 U.S.C. 7104(a); *Godwin Corp.*, ASBCA No. 61410, 18-1 BCA ¶ 37,073 at 180,449 (citing *Cosmic Construction Co. v. United States*, 697 F.2d 1389, 1390-91 (Fed. Cir. 1982)). Mr. Shafique conceded that he received the December 17, 2015 email from Mr. Sanchez, which would mean that appellant had 90 days after that date, or until March 17, 2016, to submit its appeal to the Board. This appeal was submitted in 2021.

To be sure, there was some communication between the government and appellant in February and early March 2016, but Mr. Sanchez made clear that the matter was closed and gave no indication that he was reconsidering it or open to receiving additional evidence. Hence, unlike the circumstances in other cases, such as that presented in *Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244 (Fed. Cir. 2016), there would be no basis to argue that the government had re-opened it. *See Godwin*, 18-1 BCA ¶ 37,073 at 180,449. To the extent that any argument might be made that the May 2016 communications re-opened the claim, they were more than 60 days after the time to appeal to the Board had passed, thus they

20

cannot confer jurisdiction upon us which, having lapsed, cannot be resurrected. *See id.* at 180,450.

Hence, even if appellant had the authority to bring the July 2015 claim in the first instance, it was denied on December 17, 2015, and not appealed within the statute of limitations, and we would dismiss it on that ground if we reached it.

### IV. Two Final Government Arguments

Two remaining government arguments remain to be addressed though, because they are made largely obsolete by the decision above, we will address them in less depth.

### A. Appellant Would not Have Been Able to Advance its Allegation Regarding Government Delays in Responding to its Submittals

The government has argued that we do not possess jurisdiction to consider aspects of appellant's complaint which touch upon allegations that the government was late in responding to its contract submittals because that matter was not contained in the July 2015 claim from which our jurisdiction would flow (if it had been properly submitted) (*see* gov't mot. at 22-24). Appellant does not dispute that an issue must be a subject of a claim if it is to be a basis of appeal, but contends that the July 2014 "claim" was incorporated into the July 2015 claim (app. opp'n at 12-13). Appellant is mistaken.

Although we affirmatively found that the 2015 claim was informed by the CO's rejection of the 2014 REA, the 2015 claim, in fact, made no reference to its predecessor and, though we have carefully reviewed it, we have found nothing to alert the reader that it was either adopting the arguments made in the first REA or that it was making arguments about anything other than a differing site condition. The same cannot be said for appellant's complaint, which includes a single count alleging "Uncompensated Change Orders," which mentions the alleged differing site condition almost in passing but speaks largely and vaguely about "impos[ing] new criteria on Appellant for meeting the Contract's requirements" (*see* compl. ¶¶ 21-29).

It is solidly established that an appellant cannot bring a new claim to the Board that has not been presented to the CO for his or her consideration under the guise of appealing a CO's decision on a different claim. *See, e.g., Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085, 180,534 (citing *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)). And a claim is the same only if it relies on the same operative facts and seeks the same or substantially the same relief. *Id*. As the Federal Circuit explained in *Lee's Ford Dock, Inc. v. Dep't of the Army*, "Materially different claims 'will necessitate a focus on a different or unrelated set of operative

21

facts.'" 865 F.3d 1361, 1369 (Fed. Cir. 2017) (quoting *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)). And a significantly different legal theory (perhaps because it changes which facts are determinative), makes a matter materially different than the claim presented to the contracting officer. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 777 (Fed. Cir. 2021).

Here, any assertions of entitlement to relief that stray from the straightforward differing site conditions allegations made in appellant's July 2015 claim[25] are "new," relying as they do on a dramatically different legal theory and set of operative facts and thus, would be disallowed if they had not already been dismissed as discussed above. Appellant would, however, be permitted to proceed on its differing site conditions allegations.

B.    The Matter of Appellant's Representation Before us

Last, the government has advanced the argument that counsel for appellant has not proved that he represents B-U-Z because he purports to represent a slightly differently named entity and that B-U-Z did not submit the claim in any event (*see* gov't mot. at 13). Appellant argues that its counsel was authorized by virtue of the "settlement agreement" (app. opp'n at 9). In any event, we need not decide this issue because we see no conceivable circumstance in the facts before us in which appellant would otherwise be able to maintain this appeal, but counsel were to be disqualified.

CONCLUSION

For the foregoing reasons, we dismiss this appeal for lack of jurisdiction.

Dated:  April 18, 2022

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[25] Of course, since the July 2014 REA never matured into a claim, its denial does not provide a basis for this appeal.

I concur                                                    I concur

_____          _____
RICHARD SHACKLEFORED                         MICHAEL N. O'CONNELL
Administrative Judge                                  Administrative Judge
Acting Chairman                                        Armed Services Board
Armed Services Board                               of Contract Appeals
of Contract Appeals


　　　　I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 62846, Appeal of BCC-
UIProjects-ZAAZTC Team JV, rendered in conformance with the Board's Charter.

　　　　Dated:  April 19, 2022


　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　PAULLA K. GATES-LEWIS
　　　　　　　　　　　　　　　　　Recorder, Armed Services
　　　　　　　　　　　　　　　　　Board of Contract Appeals